Theodore LUJAN, et al.,
Plaintiffs-Appellees,

v.

COLORADO STATE BOARD OF
EDUCATION, et al.,
Defendants-Appellants,

and

Adams-Arapahoe-Aurora School District
28–J, et al., Intervenors-Appellants.

No. 79SA276.

Supreme Court of Colorado,
En Banc.

May 24, 1982.
Rehearing Denied Aug. 3, 1982.

1008

Davis, Graham & Stubbs, L. Richard Freese, Jr., Joseph J. Bellipanni, Denver, David C. Long, Washington, D. C., John E. McDermott, Studio City, Cal., for plaintiffs-appellees.

Israel Galindo, Denver, for plaintiff-appellee Colorado Rural Legal Services.

·J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Stephen H. Kaplan, First Asst. Atty. Gen., Deanna E. Hickman, Asst. Atty. Gen., Denver, for defendants-appellants.

Caplan & Earnest, Gerald A. Caplan, Alexander Halpern, Boulder, for intervenors-appellants.

Philip G. Dufford, Rebecca C. Lennahan, Douglas G. Brown, Denver, for the General Assembly of the State of Colo.

McClure & Jacobs, P. C., John C. McClure, Gordon J. Bosa, Alamosa, for amici curiae Alamosa, Brighton, Centennial, Del Norte, Elizabeth, Huerfano, Monte Vista, Mountain Valley, North Conejos, Sierra Grande, South Conejos and Trinidad School Districts.

Morris W. Sandstead, Jr., Boulder, for amicus curiae American Civil Liberties Union.

Henry, Cockrell, Quinn & Creighton, Benjamin L. Craig, Denver, for amici curiae Douglas County School Dist. Re. 1, School Dist. No. 50 in Adams County, and School Dist. No. 11 in El Paso County.

HODGES, Chief Justice.

■ The trial court declared Colorado's system of financing public elementary and secondary education unconstitutional. This school finance system is encompassed within the provisions of the Public School Finance Act of 1973, section 22–50–101 *et seq.*, C.R.S.1973 and 1981 Cum.Supp., and is affected by the statutory provisions relating to the capital reserve fund, sections 22–40–102(4) and 22–45–103(1)(c), C.R.S. 1973 and 1981 Cum.Supp., and those provisions pertaining to the bond redemption fund, sections 22–42–104(1)(a) and 22–45–103(1)(b), C.R.S.1973 and 1981 Cum.Supp.[1] Appellants are the Colorado State Board of Education and its members. Intervenors-Appellants are 26 school districts within Colorado who challenge the trial court's declaration. The appellees are school children residing in 16 of the 181 school districts located within the state, who, as plaintiffs below, sought a ruling that the school finance system was unconstitutional.

The trial court determined that the school finance system, which derives approximately forty-seven percent of its operating income from local property tax levies, violates the equal protection provisions of the United States and the Colorado Constitutions, and also violates the Colorado constitutional mandate that a "thorough and uniform"

---

1. While it is our obligation to decide this appeal based on the law as it presently stands, *Hall v. Beals*, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), the intervening statutory amendments have worked no corporeal change in the substance of the school finance system since the trial court entered judgment in 1979. *See Colo. Sess.Laws* 1981, ch. 252, 22–50–102 at 1075; ch. 242, 22–50–104 at 1056–1057; *Colo.Sess.*

Laws 1980, ch. 99, 22–50–105 at 558–560; ch. 97, 22–50–103 at 551–553; *Colo.Sess.Laws* 1979, ch. 200, 22–50–116 at 797; ch. 199, 22–50–104 at 795–796; ch. 198, 22–50–102 at 794; ch. 188, 22–50–101.5 at 779; *Colo.Sess.Laws* 1978, ch. 69, 22–50–105 at 369–374. Accordingly, our discussion will focus on the provisions of the school finance system in effect in 1979, unless special mention is warranted.

system of public schools be provided. *Colo. Const.* Art. IX, Sec. 2.[2] We reverse the trial court's judgment.

Contrary to the trial court, we hold that Colorado's school finance system does not violate Article IX, Section 2 of the Colorado Constitution, nor does it deny equal protection of the law to plaintiffs-appellees, or those similarly situated. We also hold, contrary to the trial court, that Colorado's method of capital outlay financing is constitutional and rule that this method of capital financing, whereby each local school district is governed by a limitation on its taxing authority, is rationally related to a legitimate state purpose.

## I. *Historical Background*

By section 7 of the Colorado Enabling Act, the Congress of the United States set aside certain lands in each township of Colorado "for the support of the common schools." 18 pt. 3, U.S.Stat. at L., 474 (1875).

Since statehood, public schools in Colorado have been financed by locally levied property taxes and state contributions. The state's contribution was initially limited to the revenue generated through the interest, rentals, and leases on the state-owned school lands. In 1935, the first direct state support of local school districts was enacted. It was challenged and found to be constitutional in *Wilmore v. Annear*, 100 Colo. 106, 65 P.2d 1433 (1937). Since 1935, a combination of local property tax levies and direct state contributions has been the principal source of financial support for Colorado's public school system.

In 1952, following a study of the school finance system by a Governor's committee, the General Assembly passed the first Public School Finance Act. *See* Colorado Legislative Council, *Report to the Colorado General Assembly: State Aid to Schools in*

*Colorado,* Research Publ. No. 117 (1966). This Act provided each school district with an equalization "support level" or set amount of money for each district in each calendar year. However, this Act was soon criticized for not eliminating the spending disparities among the school districts. Apparently in response to this criticism, the General Assembly enacted the Public School Finance Act of 1973, sections 22–50–101 *et seq.*, C.R.S.1973 [hereinafter PSFA], which was challenged in the trial court and is the subject of this appeal. To understand the nature and substance of the issues before us, it is necessary to examine some of the features of Colorado's school finance system.

## II. *The School Finance System*

There are currently 181 school districts in Colorado providing a kindergarten through twelfth grade education for 535,085 students. Under the PSFA, the school system is financed primarily from local, state, and federal revenues. As an example, in 1977, local taxes generated forty-seven percent of public school funds, the state general fund provided forty-three percent, federal revenues accounted for six percent, and miscellaneous sources contributed the remaining four percent.

Under statutory provisions for levying taxes for educational purposes, each school district shall certify to the county commissioners the amount of revenue needed for operating its school system. The county commissioners then place a levy against the valuation of taxable property within the district's boundaries to raise the desired revenue. Sections 22–40–102(1) and (2), C.R.S.1973 (1978 Supp. and 1981 Cum. Supp.). Each school district may expend all such revenue collected within its boundaries, provided it is used strictly for educational purposes.

---

2. Article IX, section 2 of the Colorado Constitution states:

"*Establishment and maintenance of public schools.* The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, be-

tween the ages of six and twenty-one years, may be educated gratuitously. One or more public schools shall be maintained in each school district within the state, at least three months in each year; any school district failing to have such school shall not be entitled to receive any portion of the school fund for that year."

The school finance system creates four main components to provide funding for the general educational efforts of a school district. These components are authorized revenue base, state equalization aid, guaranteed yield plan, and capital outlay financing.

### A. Authorized Revenue Base

The authorized revenue base (ARB) is a specified dollar amount established annually for each district, and is the maximum annual amount a district may spend in general operating expenses per pupil. The ARB amount was first established for each district in 1974, and was based in part on the amount each district was then spending per pupil. This spending figure was used by the General Assembly as an estimate of what the educational costs were for each district. However, the ARB has been adjusted upwards, especially in the low spending districts, to more accurately reflect the educational needs of the districts. Under S.B. 11, *Colo.Sess.Laws* 1980, ch. 99, 22–50–105 at 559, the minimum ARB in 1982 will be $2,000 per pupil, or the 1981 ARB level plus $160, whichever amount is greater. *Compare*, S.B. 25, *Colo.Sess.Laws* 1978, ch. 69, 22–50–106 at 371–372.

A school district may increase its ARB by one of two ways. First, by requesting an ARB increase from the State School District Budget Review Board. Second, if this request is refused in part or in whole, by holding an election so that the electorate may decide on the increase. Sections 22–50–107 and 108, C.R.S.1973. When an ARB increase is granted under either procedure, the district is responsible for funding the increase for the first year. Thereafter, it is included in the formula determining the state equalization aid.

### B. State Equalization Aid

The statutory equalization program, section 22–50–105, C.R.S.1973 and 1981 Cum. Supp., provides financial support for districts lacking a high tax base or revenue raising capacity. Under this section, a district with low revenue generating capacity will receive aid to bridge the difference between revenues generated by local property tax levies and the statutorily guaranteed amount. For example, in 1977, the General Assembly passed S.B. 138 amending the state equalization program in order that $35.00 per pupil would be guaranteed for each mill levied for the general fund of a school district. *Colo.Sess.Laws* 1977, ch. 264, 22–50–105.

A formula used in determining whether a district is entitled to equalization aid can be illustrated by applying it to the South Conejos School District, a district receiving considerable state equalization aid:

Assessed Valuation (AV)[3] . . . . . . . . . $4,772,260.00
Authorized Revenue Base (ARB) . . $ 1,181.08
Attendance Entitlement (AE) . . . . 782 students

Then it is necessary to apply these figures to the formula to determine the local share per mill[4] per pupil:

$$\frac{AV \times 1\ mill}{AE} = \frac{\$4{,}772{,}260 \times 0.001}{782} = \$6.10/mill/pupil$$

State Guarantee . . . . . . . . . . . . . . . . . $35.00
Local Share . . . . . . . . . . . . . . . . . . . . $ 6.10
State Equalization Aid . . . . . . . . . . . . $28.90/mill/pupil

To determine the mill levy:

$$\frac{ARB}{State\ Guarantee} = \frac{\$1{,}181.08}{\$35.00} = 33.75$$

With the mill levy being 33.75, the state equalization aid per student is $28.90 × 33.75 = $975.38. Thus, the total State aid to the South Conejos School District in 1978 was $975.38 × 782(AE) = $762,844.00.

Accordingly, the State provided the South Conejos School District with the difference between the state guaranteed amount and the revenue raised by a 1 mill levy. In stark contrast, a 1 mill levy in Rangely School District, a district with higher taxable property values, raised $326.27 per pupil during this same period. The Rangely School District was therefore clearly ineligible for State equalization aid.

---

**3.** Assessed valuation is the sum of the total value assigned to all taxable real property within the taxing district.

**4.** A mill is a monetary unit frequently used in taxation which has the value of one-tenth of a cent.

### C. *Guaranteed Yield Plan*

Regardless of a school district's ability to raise local taxes to meet or exceed the State's equalization aid of $35/mill/pupil, the guaranteed yield provides each district with a flat grant per pupil per mill. Section 22–50–105(2)(d), C.R.S.1973 (1978 Supp. and 1981 Cum.Supp.). If a district levied in excess of 20 mills, the minimum guarantee was $11.35 per mill per pupil in 1979, $13.35 in 1980, $14.41 in 1981, and will be $15.53 in 1982. If the district levied at less than 20 mills, the minimum guarantee of $11.35 set in 1979 remains in effect through 1982. In effect, the act gives a district the benefit of either the State's share as calculated by the equalization formula or the minimum guarantee, whichever is greater. As an example, the finance formula as applied to the Englewood School District for 1978, resulted in the following guaranteed yield:

Assessed Valuation . . . . . . . . . . . $105,870,300.00
Authorized Revenue Base . . . . . . $ 1,720.85
Attendance Entitlement . . . . . . . . 4,201.80

$$\frac{\$105,870,300 \times 0.001}{4,201.80} = \$25.20/\text{mill/pupil}$$

Accordingly, under State equalization aid, the Englewood School District would receive $9.80/mill/pupil ($35.00 minus $25.20). However, because of the minimum guaranteed yield, the minimum this district actually received was $11.35/mill/pupil. Thus, in 1978, the Englewood School District had a financial budget of $36.35/mill/pupil or $1.35/mill/pupil over the $35.00 guaranteed yield.

### D. *Capital Outlay Financing*[5]

There are two primary methods by which school districts may finance capital construction projects: the capital reserve fund, section 22–45–103(1)(c), C.R.S.1973 and 1981 Supp., and the bond redemption fund, section 22–45–103(1)(b), C.R.S.1973. Both funds are financed entirely out of local property tax revenues.

(1) *Capital Reserve Fund.* The levy for the capital reserve fund may not exceed four mills in any given year. Section 22–40–102(4), C.R.S.1973. Expenditures from this fund are limited to long-range future programs with purposes such as acquisition of land and the construction of buildings thereon or the construction of additions to existing structures. Section 22–45–103(1)(c)(I), C.R.S.1973.

The trial court found that the present capital reserve fund operates so that high-wealth districts can raise more revenue from the statutory maximum of four mills than a low-wealth district can. The facts support this finding. In 1977, for example, the Frisco School District was able to raise $386.52 per pupil under the four mill levy, while the South Conejos School District was only able to generate $23.60 per pupil.

(2) *Bond Redemption Fund.* This fund is used for major building projects and is subject to approval by the electorate. It operates under a statutorily imposed debt ceiling equal to 20% of a district's assessed property valuation. Section 22–42–104(1)(a), C.R.S.1973.

The trial court thus found that high-wealth districts were able to generate far greater revenue within the statutory debt ceiling than were the low-wealth districts. Evidence at trial revealed that in 1977, the school districts in the top 10% of assessed property valuation had an average bond redemption rate of 4.74 mills, generating an average yield of $184.50 per pupil, while school districts in the lowest 10% levied at a rate of 12.56 mills, yielding $98.44 per pupil. The bond redemption fund operated so that, in 1978, for example, the South Conejos School District had a debt ceiling of $954,452 while the Granby School District's debt ceiling was $8,173,380.

### III. *Statement of Positions*

In summary, the overall scheme of funding Colorado's public schools rests in part upon the property values within each district. Because of the differences in assessed valuations of the districts, the amounts raised and spent per pupil vary

---

**5.** *See generally* M. Groshek, *Colorado Municipal Bonds—A Revolution*, 4 Colorado Lawyer 1055, 1065 (1975). *See also* D. Hodgman and

W. Kramer, *Bondholders and Schoolchildren—The Effect of the Serrano Rule on School Bond Financing*, 4 Urban Lawyer, 643 (1972).

among the several districts. Appellants contend that this system is both rationally related to a legitimate State purpose and essential to fostering local control within each school district. Appellees, on the other hand, argue that the school finance system violates the equal protection clause by interfering with their fundamental right to education and by creating a "suspect classification" based on wealth. They argue that the school finance system becomes subject to strict judicial scrutiny, which requires that the school finance system be shown to be necessary to serve a compelling governmental interest. Appellees then submit that the trial court was correct in holding that the school finance system failed to satisfy the strict judicial scrutiny test.

With those facts before us, we must first determine whether Colorado's school finance system impinges on a fundamental right or operates to the disadvantage of a suspect class under the equal protection guarantees found in the United States and Colorado Constitutions. If so, the school finance system is subject to strict judicial scrutiny, which was the view of the trial court. If not, we need to then examine whether the school finance system rationally furthers some legitimate state purpose thereby satisfying the dictates of the equal protection guarantee. Lastly, we must determine whether the school finance system complies with the state's constitutional mandate to provide a "thorough and uniform" system of free public schools.

### IV. Equal Protection Analysis

The first issue presented in this case is whether or not Colorado's school finance system violates the constitutional guarantees of equal protection of the laws provided in the United States and the Colorado Constitutions.

 The trial court declared that the Colorado school finance system interferes with the "fundamental right" to education, and

establishes a wealth-based "suspect" classification, thus requiring the system to be subject to strict judicial scrutiny. Consequently, the trial court ruled that both of these effects violated the equal protection guarantee under the Colorado Constitution, since they were not supported by a "compelling state interest," under the strict judicial scrutiny test. In addressing this issue, we will look to the effect of the school finance system as well as to its form, because legislation may create impermissible classifications through its application though not by its language. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Appellants contend that education is not a "fundamental right" in Colorado and that wealth-based classifications do not create a "suspect" class. They argue the school finance system need not satisfy the higher standard of a "compelling state interest," but rather need only be rationally related to a legitimate state purpose. Appellants then submit that the latter standard is clearly met as the General Assembly responded rationally in enacting this finance system for the purpose of allowing local control over the educational and financial needs of each school district in Colorado.

 The Fourteenth Amendment to the United States Constitution declares that no state shall deny a person equal protection of the law. Although the Colorado Constitution does not contain an identical provision, it is well-established that a like guarantee exists within the constitution's due process clause, *Colo.Const.* Art. II, Sec. 25, and that its substantive application is the same insofar as equal protection analysis is concerned. *See Heninger v. Charnes*, Colo., 613 P.2d 884 (1980); *People v. Layton*, Colo., 612 P.2d 83 (1980); *People v. Max*, 70 Colo. 100, 198 P.2d 150 (1921).[6]

 As in other jurisdictions, we have come to recognize that the equal protection

---

**6.** Similarly, while the federal government is not subject to the Federal Equal Protection Clause, the Supreme Court has held that federal actions fall under the aegis of equal protection by virtue of the Federal Due Process Clause. *U.S.*

*Const.* amend. V. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), *supplemented Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

guarantee insures that all individuals be treated fairly in their exercise of fundamental rights,[7] and that suspect classifications [8] based on impermissible criteria be eliminated. *People v. Childs,* 199 Colo. 436, 610 P.2d 101 (1980). *See also J. Nowak,* R. Rotunda & J. Young, *Handbook on Constitutional Law* (1978) [hereinafter *J. Nowak, et al.,*]. Under equal protection analysis, legislative enactments are accorded their usual presumption of validity; however, this presumption disappears when the statutory classification impacts on a fundamental right or a suspect class. In such situations, we will employ a more scrutinizing review when determining the constitutionality of the legislation. In Colorado, we recognize three standards of review within equal protection analysis.

■ The first standard is invoked where the statutory classification is based on gender. In this situation, the State must show that the classification serves important governmental objectives and that it is substantially related to achievement of those objectives. *R. McG. v. J. W.,* Colo., 615 P.2d 666 (1980). *Cf. Colo.Const.* Art. II, Sec. 29;

*People v. Green,* 183 Colo. 25, 514 P.2d 769 (1973) (where the constitutionality of the rape statute is analyzed under Article II, Section 29 of the Colorado Constitution). *See also Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Since this case does not involve a gender-based classification, no further discussion of this standard of review is necessary.[9]

■ The second standard of review occurs where a fundamental right is affected or a suspect classification is created. Here, the state has the burden of establishing that the act is necessarily related to a compelling governmental interest. *Heninger v. Charnes, supra. See also San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973) [hereinafter *Rodriguez*]; *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed.2d 1234 (1938). While the party asserting this challenge must first demonstrate that a fundamental interest or suspect class is involved,

---

**7.** Fundamental rights are essentially those rights which have been recognized as having a value essential to individual liberty in our society. For example, *see Carey v. Population Services Intern.,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (right of privacy: to bear or beget children); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1974) (right to marriage); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of a uniquely private nature—abortion); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (right of privacy—contraception); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (right to vote); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right of interstate travel); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (rights guaranteed by the First Amendment); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right of parents to direct the upbringing of their children). While there is confusion as to what other rights or interests are deemed fundamental, *see Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), we need not resolve this question since the issue before us addresses

only whether the right to public education is fundamental.

**8.** A classification is considered "suspect" if it singles out religious, racial, or other discrete and insular minorities such as those based on lineage or alienage. *Pollock v. City and County of Denver,* 194 Colo. 380, 572 P.2d 828 (1977). *See Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (ancestry). *Cf. Skafte v. Rorex,* 191 Colo. 399, 553 P.2d 830 (1976), *appeal dismissed for want of federal question,* 430 U.S. 961, 97 S.Ct. 1638, 52 L.Ed.2d 352 (1977) (aliens).

**9.** We recognize that the United States Supreme Court has adopted this intermediate standard of review for a variety of other classifications. *See Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (illegitimacy); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1979) (alienage). *See also J. Nowak, supra,* at 524–526; Note, *Developments in the Law—Equal Protection,* 82 Harv.L.Rev. 1065 (1969).

*People v. Sprengel*, 176 Colo. 277, 490 P.2d 65 (1971), once successful, the state then has the burden of showing that the act is necessarily related to a compelling governmental interest, and, when applicable, of showing that the classification is specifically fashioned and narrowly tailored to further its legitimate objective. *See Rodriguez, supra; Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

■ The third standard of review applies where no fundamental right, suspect classification, or gender classification is involved. In such instance, we will only inquire whether the state action is rationally related to a legitimate state purpose. *Fritz v. Regents of University of Colorado*, 196 Colo. 335, 586 P.2d 23 (1978).

The next step in equal protection analysis is to assign the proper standard of review by determining whether the right to a free public education is a fundamental right and whether wealth is a suspect class.

A. *Education as a Fundamental Right*

In its equal protection analysis, the trial court found that education is a fundamental right under the Colorado Constitution.

■ At the outset, we note that *Rodriguez* holds that education is not afforded explicit or implicit protection under the United States Constitution. *Id.* 411 U.S. at 35, 93 S.Ct. at 1297. From our analysis of this holding and the accompanying discussion, we conclude that *Rodriguez* states that education is not a fundamental right under the United States Constitution, and therefore, is not subject to strict judicial scrutiny.[10]

■ The United States Supreme Court is the final interpreter of the United States Constitution, *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); and *Rodriguez* resolves this federal issue. Accordingly, since the facts in this case are essentially identical to those in *Rodriguez*, its pronouncements clearly negate any claim that the Colorado school finance system interferes with a fundamental right to education under the equal protection provision of the United States Constitution. The issue remaining within this inquiry is whether education is a fundamental right under the Colorado Constitution.[11]

**10.** After analyzing education in relation to the equal protection guarantee of the United States Constitution, the Supreme Court in *Rodriguez* concluded:

"It should be clear, for the reasons stated above and in accord with the prior decisions of this Court, that this is not a case in which the challenged state action must be subjected to the searching judicial scrutiny reserved for laws that create suspect classifications or impinge upon constitutionally protected rights." 411 U.S. at 40, 93 S.Ct. at 1300.

**11.** State courts are, of course, free to consider the merits of a constitutional challenge under their own constitutional provisions, and they are free to do so independently of United States Supreme Court opinions, even when the State and Federal Constitutions are similarly or identically phrased. *See Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.Ct. Rev. 489 (1977). Although public education is specifically required by forty-nine state constitutions, Comment, *State Constitutional Restrictions on School Finance Reform: Buse v. Smith*, 90 Harv.L.Rev. 1528 N. 2 (1977), state court decisions have reached differing results on the issue of fundamentality.

For decisions finding that its state constitution *does* create a fundamental right in education, *see Alma School Dist. No. 30 of Crawford County, et al. v. Dupree, et al.*, No. 77–406 (Ch.Ct. of Pulaski Cty., Ark., October 26, 1981); *Somerset County Board of Education, et al. v. Hornbeck, et al.*, No. A–58438 (Cir.Ct., Baltimore, Md., May 19, 1981); *Washakie Co. Sch. Dist. No. One v. Herschler*, 606 P.2d 310 (Wyo. 1980); *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Pauley v. Kelly*, 255 S.E.2d 859 (W.Va.1979); *Seattle Sch. Dist. No. 1 of King County v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978); *Buse v. Smith*, 74 Wisc.2d 550, 247 N.W.2d 141 (1976); *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 (1976); *Serrano v. Priest (Serrano II)*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Shofstall v. Hollins*, 110 Ariz. 88, 515 P.2d 590 (1973); *Serrano v. Priest (Serrano I)*, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L. R.3d 1187 (1971); *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273, *cert. denied sub nom., Dickey v. Robinson*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

For decisions finding that education is *not* a fundamental right, *see McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 (1981); *Board of Education of the City School Dist. of Cincinnati*

In *Rodriguez*, the United States Supreme Court held that whether education is fundamental under the Federal Constitution is determined not by comparisons of the relative societal significance of education as opposed to subsistence or housing but:

"Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution."

■ Article IX, Section 2 of the Colorado Constitution explicitly requires the General Assembly to establish "a thorough and uniform system of free public schools throughout the state." Accordingly, if this court were to adopt the *"Rodriguez* test," educational opportunity would then arguably be a fundamental interest in Colorado entitled to strict scrutiny. However, we reject the *"Rodriguez* test." While the test may be applicable in determining fundamental rights under the United States Constitution,[12] it has no applicability in determining fundamental rights under the Colorado Constitution. This is so because of the basic and inherently different natures of the two constitutions as will be briefly discussed in the following paragraphs.

■ The United States Constitution is one of restricted authority and delegated powers. As provided in the Tenth Amendment, all powers not granted to the United States by the Constitution, nor denied to the States by it, are reserved to the States or to the People. *See United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430 (1941). *See also U.S. Const.* Art. IX.

■ Conversely, the Colorado Constitution is not one of limited powers where the state's authority is restricted to the four-corners of the document. *People ex rel. Rhodes v. Fleming*, 10 Colo. 553, 16 P. 298 (1887). The Colorado Constitution does not restrict itself to addressing only those areas deemed fundamental. Rather, it contains provisions which are both equally suited for statutory enactment, *e.g.*, Mining and Irrigation, *Colo.Const.* Art. XVI, and Nuclear Detonations, *Colo.Const.* Art. XXVI; as well as those deemed fundamental to our concept of ordered liberty, *e.g.*, Freedom of Elections, *Colo.Const.* Art. II, Sec. 5. Thus, under the Colorado Constitution, fundamental rights are not necessarily determined by whether they are guaranteed explicitly or implicitly within the document.

On its face, Article IX, Section 2 of the Colorado Constitution merely mandates action by the General Assembly—it does not establish education as a fundamental right, and it does not require that the General Assembly establish a central public school finance system restricting each school district to equal expenditures per student.

■ We recognize unequivocally that public education plays a vital role in our free society. It can be a major factor in an individual's chances for economic and social success as well as a unique influence on a child's development as a good citizen and on his future participation in political and community life. *See Rodriguez, supra; Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954); *People*

---

*v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Matter of Levy*, 38 N.Y.2d 653, 382 N.Y.S.2d 13, 345 N.E.2d 556, *appeal dismissed for want of Fed'l question*, 429 U.S. 805, 97 S.Ct. 39, 50 L.Ed.2d 66 (1976); *Olsen v. State*, 276 Or. 9, 554 P.2d 139 (1976); *Thompson v. Engleking*, 96 Idaho 793, 537 P.2d 635 (1975); *Milliken v. Green*, 390 Mich. 389, 212 N.W.2d 711 (1973).

**12.** We note parenthetically that the *"Rodriguez* test" may not even be an accurate guide in determining fundamental rights under the United States Constitution. As the New Jersey

Court pointed out in *Robinson v. Cahill*, 62 N.J. 473, 491, 303 A.2d 273, 282 (1973):

"... the proposition discussed in *Rodriguez*, that a right is 'fundamental' if it is explicitly or implicitly guaranteed in the constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment."

*Accord, Board of Education of the City School District, Etc. v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), *cert. denied*, 444 U.S. 1015, 100 S.C. 665, 62 L.Ed.2d 644 (1980).

v. *Y.D.M.*, 197 Colo. 403, 593 P.2d 1356 (1979). *See also* Note, *Development in the Law-Equal Protection*, 82 Harv.L.Rev. 1065 (1969); F. Schoettle, *The Equal Protection Clause in Public Education*, 71 Colum.L. Rev. 1355 (1971).[13] However, we do not accept appellees' argument that because public education plays such a vital role in our society, any disparate impact resulting from the application of the school finance statutes, amounts to an unjustifiable governmental interference with the individual's right to speak and to vote. Such an argument was effectively rejected in *Rodriguez, supra*, and we agree with the United States Supreme Court's statement that:

"We have never presumed to possess either the ability or the authority to guarantee to the citizenry the most *effective* speech or the most *informed* electoral choice." (Emphasis in original.)

While our representative form of government and democratic society may benefit to a greater degree from a public school system in which each school district spends the exact dollar amount per student with an eye toward providing identical education for all, these are considerations and goals which properly lie within the legislative domain. Judicial intrusion to weigh such considerations and achieve such goals must be avoided. This is especially so in this case where the controversy, as we perceive it, is essentially directed toward what is the best public policy which can be adopted to attain quality schooling and equal educational opportunity for all children who attend our public schools. *See* M. Cox, *State Judicial Power: A Separation of Powers Perspective*, 34 Okla.L.Rev. 207, 227 (1981).

The method Colorado has chosen for funding public school education is the real focal point of the challenge here. We note that appellees did not allege or prove that they are being denied an educational opportunity. Appellees instead argue that we should accept, amidst a raging controversy, that there is a direct correlation between school financing and educational quality and opportunity. We refuse, however, to venture into the realm of social policy under the guise that there is a fundamental right to education which calls upon us to find that equal educational opportunity requires equal expenditures for each school child. Even if we were to accept appellees' contention, we would, nonetheless, refuse to adopt their *a priori* argument whereby a lack of complete uniformity in school funding between all of the school districts of Colorado necessarily leads to a violation of the equal protection laws in this state.

Lastly, a review of the record and case law shows that courts are ill-suited to determine what equal educational opportunity is, especially since fundamental disagreement exists concerning the extent to which there is a demonstrable correlation between educational expenditures and the quality of education. *See Rodriguez, supra*, nt. 86 at 411 U.S. at 43, 93 S.Ct. at 1302; *Serrano v. Priest*, (Serrano I), 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187 (1971); *Robinson v. Cahill, supra*.

A heartfelt recognition and endorsement of the importance of an education does not elevate a public education to a fundamental interest warranting strict scrutiny. The constitutional mandate which requires the General Assembly to establish "a thorough and uniform system of free public schools," is not a mandate for absolute equality in educational services or expenditures. Rather, it mandates the

---

**13.** Jurisdictions which find education to be a fundamental right often cite to *Brown* as support for that proposition. *See, e.g., Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359, 372 (1977). Nonetheless, while the *Brown* court did state that education is "perhaps" the most important function of state and local governments, *Brown v. Board of Education, supra*, at 347 U.S. at 493, 74 S.Ct. at 691, that statement was made in connection with the court's assessment of the effect of racial segregation on children during their formative years in school. Thus, the *Brown* decision must be read in its proper context, namely, that the strict scrutiny test was applied in *Brown* not because education is a fundamental interest, but because classification by race is clearly suspect. *Accord Parker v. Mandel*, 344 F.Supp. 1068, 1077 (D.Md.1977); *Robinson v. Cahill, supra*.

General Assembly to provide to each school age child the opportunity to receive a free education, and to establish guidelines for a thorough and uniform system of public schools.

## B. *Wealth as a Suspect Classification*

The trial court found that the totality of the evidence in this case establishes a wealth-based suspect classification requiring strict judicial scrutiny under equal protection analysis. The court went on to find that the school finance system violated the equal protection clause of both the United States and the Colorado Constitutions by failing to demonstrate that the suspect classification is necessarily related to a compelling governmental interest.

Concerning the United States Constitution, the trial court found that the facts in this case were distinguishable from those in *Rodriguez*, and thus held that *Rodriguez* was not controlling. We disagree.

■■■■ In *Rodriguez*, the United States Supreme Court conceded that prior decisions have applied strict scrutiny review to wealth-based classifications; however, the court emphasized that the facts in those cases had two characteristics which distance them from the situation in *Rodriguez*. First, the plaintiffs in those cases were completely unable to pay for some desired benefit due to their impecunity; and second, as a consequence, they sustained an absolute deprivation of a meaningful opportunity to exercise a fundamental right.

Thus, it was concluded in *Rodriguez*, where the facts were essentially identical to the facts presented here, that wealth-based distinctions alone do not create a suspect class under the equal protection provisions of the United States Constitution, and that strict scrutiny review is applied only where wealth is entwined with a recognized fundamental right.[14] *Id.* 411 U.S. at 20–22, 93 S.Ct. at 1290–1291.

■■■ We find that *Rodriguez* clearly addresses and discards appellees' wealth based equal protection claim under the United States Constitution. Simply, the *Rodriguez* court stated:

"... a sufficient answer to appellees' argument is that, at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages."

*Id.* 411 U.S. at 24, 93 S.Ct. at 1291. Other states which have confronted this same issue, have held, as we do here, that *Rodriguez* establishes that wealth alone in public school finance cases is not a suspect classification under the Equal Protection Clause of the United States Constitution. *See Washakie Co. Sch. Dist. No. One v. Herschler, supra,* 606 P.2d at 319; *Serrano v. Priest (Serrano II), supra,* 557 P.2d at 950–951; *Robinson v. Cahill, supra,* 303 A.2d at 379; *Milliken v. Green, supra,* 212 N.W.2d at 714.

The issue of whether wealth is a suspect class under the Colorado Constitution is one of first impression. We note at the outset that the relative wealth criterion allegedly

14. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (indigent's right to interstate travel penalized by durational residence requirement); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (indigent's right to divorce supersedes required filing fees); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (indigent's right to vote exists without satisfying poll tax requirement); *Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (indigent's right to habeas corpus attack of criminal conviction infringed by filing fee requirement); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (indigent's right to counsel on criminal appeal); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055 (1956) (indigent's right to free trial transcript upon criminal appeal).

The proposition that strict scrutiny is accorded indigents only when a fundamental right is involved is also supported by reviewing those decisions where a fundamental right was not involved. For example, the Supreme Court has held that once the state has satisfied the indigent's fundamental rights, it is no longer obligated to level all other economic distinctions. *Ross v. Moffit,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (indigent not entitled to counsel in discretionary appeal). *See also United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (filing fee in bankruptcy proceeding need not be waived for indigents).

used in the school finance system differs fundamentally from situations where, due to their inability to pay, indigents are totally excluded either from participation in institutions or from exercising their rights. *See Franklin v. Dist. Ct. of Tenth Jud. Dist. In and For the County of Pueblo*, 194 Colo. 189, 571 P.2d 1072 (1977).[15] That is not the situation in this case, and therefore, we limit our review to the issue of whether wealth alone creates a suspect classification under Colorado's equal protection provisions.

 As previously noted, in asserting that legislation unconstitutionally impinges on a suspect class, appellees herein have the burden of establishing that they constitute such a class. *People v. Sprengel, supra; Dunbar v. Hoffman*, 171 Colo. 481, 468 P.2d 742 (1970). We hold in this case that appellees have failed to prove that they constitute a recognized, distinct class.

Appellees argue that a "suspect class" is present here either as a "class" composed of low-wealth school districts, or as a "class" composed of low-income people. We disagree. The evidence in this case does not demonstrate that the school finance system operates to the peculiar disadvantage of any identifiable, recognized class.

 *First*, the criteria for a suspect class cannot be met by a school district regardless of the merits. As the supreme court emphasized in *Shelly v. Kramer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441 (1948), the equal protection clause embodies personal rights, and by its very terms is limited to individuals. We find that same restriction to apply in Colorado's

equal protection guarantee. In short, a political body cannot be a suspect class. *See Board of County Commissioners v. City and County of Denver*, 150 Colo. 198, 372 P.2d 152 (1962), *appeal dismissed for want of federal question*, 372 U.S. 226, 83 S.Ct. 679, 9 L.Ed.2d 714 (1963).

*Second*, there is no distinct and insular "class" of poor persons[16] as required for equal protection analysis. Under this analysis, we define a "class" as being a group marked by common attributes or characteristics. Here, however, the alleged class of "poor persons," while possibly linked by their respective income levels, have no common attribute relative to Colorado's school financing system. The evidence does *not* show that poor persons in Colorado are concentrated in low-property wealth districts, or that they uniformly or consistently receive a lower quality education, or that the districts in which they reside uniformly or consistently expend less money on education.

For example, evidence at trial shows that Denver has the greatest concentration of school children from low-income families. Yet, Denver, by comparison, is a relatively high property wealth district. Thus, it is incorrect to suggest that poor persons, as a class, receive discriminatory treatment from PSFA. Secondly, a Colorado Department of Education study shows that there is no correlation between low-property wealth districts and low-income residents.[17] Indeed, the study suggests that it is more accurate to state that a correlation exists between a district's property wealth and pupil population. For example, the study

---

**15.** We would possibly find wealth to be a suspect classification if the right to attend public elementary or secondary schools was made dependent upon the net worth of the pupil or his parents, or if the General Assembly mandated that local government limit its current expenditures based on its taxable property valuations. However, such is not the case here. At most, local school expenditures are influenced by the size of the tax base, along with other considerations, *e.g.*, the collective judgment of local officials. In this respect, education is handled similarly to other essential services, like fire and police protection.

**16.** We are defining "poor" persons as those below the Bureau of Census "poverty level." *See Rodriguez, supra*, at 411 U.S. at 23, 93 S.Ct. at 1291.

**17.** *See also Note: A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars*, 81 Yale L.J. 1303 (1972); *Rodriguez, supra* at 411 U.S. 27 N. 64, 93 S.Ct. at 1293 N. 64. *But see Serrano v. Priest (Serrano I), supra.*

reports that in 1977, the Arapahoe School District in Cheyenne County had an assessed taxable property valuation of $3,785,270, while South Conejos School District's valuation was $4,675,100. Yet, due to disparities in pupil population, Arapahoe's assessed valuation per pupil was $52,940.84, while South Conejos' valuation per pupil was $5,897.69. Colorado Department of Education, *The Impact of the Public School Finance Act—Fifth Year Analysis of the Act—1978 Budget Year (1978).*

■ Appellees have failed to prove that they compose a class which is identifiably distinct and insular. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). There is no evidence showing a satisfactory statistical correlation between poor persons within the state and low-spending school districts. We find that such a correlation is essential if we are to apply strict judicial scrutiny to an invidious discrimination of a "suspect class."

Additionally, even though appellees do not constitute a recognized class for equal protection purposes, we find that even if they did, wealth alone would not create a suspect classification in Colorado.

■ Traditionally, suspect classifications have been restricted to those groups which are readily identifiable by a common racial or lineal trait. One explanation for this is that race and lineage are congenital, unalterable characteristics. *See* 82 Harv.L. Rev. *supra* at 1126–1127. Another view points out that discrimination against individuals within suspect classes has been habitual, which in turn, warrants the preferred treatment. *See Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880). Here, however, the alleged "class" of low-income persons constitutes an incredibly amorphous group, a group which changes over time and by context, and which is unable to show the historical pattern of discrimination that traditional "suspect" classes can.

In *Rodriguez,* the court reiterated the traditional features of suspectness: namely, (1) that the class is either subjected to a history of purposeful unequal treatment with its attendant disabilities, or (2) it is relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. It is evident in this case that appellees do not satisfy either of these indicia of suspectness.

Appellees present no evidence to show that they have been subjected to a history of purposeful unequal treatment. Indeed, a review of Colorado's school finance system presents a contrary position. Colorado has historically sought equality between the school districts, making a concerted effort to avoid any disparate impact upon the poor. As this court noted in the early case of *McCartey v. School Dist. No. 9,* 75 Colo. 305, 309, 225 P. 835, 836 (1924):

> "It is perfectly clear from an examination of this entire act [providing minimum salaries for Teachers] that its chief purpose is to raise the education standard in the [financially] weaker districts of the state and place the burden incident thereto upon the [financially] stronger districts and, in the case of necessity, upon the state itself."

The historical development of public education in Colorado has been centered on the philosophy of local control. *See Colo.Const.* Art. IX, Sec. 15; *School Dist. No. 16 v. Union High School No. 1,* 60 Colo. 292, 152 P. 1149 (1915); *Merrill v. Barr,* 73 Colo. 87, 213 P. 576 (1923); *People ex rel. Vollmar v. Stanley,* 81 Colo. 276, 255 P. 610 (1927). *See also Carey v. Board of Education of Arapahoe School District,* 598 F.2d 535 (10th Cir. 1979). Taxation of local property has not only been the primary means of funding local education, but also of insuring that the local citizenry direct the business of providing public school education in their school district.[18] This was clearly expressed in

---

**18.** This emphasis on local control is partly based on the concern that greater state control over funding will lead to greater state power over local educational programs and policies. A list of authorities discussing this concern is

*Belier v. Wilson,* 59 Colo. 96, 147 P. 355 (1915), where this court held that under Article IX, Section 15 of the Colorado Constitution, the Otero County Commissioners could not levy a tax upon property located within their School District No. 9 for the support of their School District No. 11. To do otherwise, would sever the link connecting the local citizenry to their school district.

In short, we find that appellees have failed to show they have been subjected to a history of purposeful unequal treatment. *Accord, Massachusetts Bd. of Retirement v. Murgia, supra*; and *Rodriguez, supra.*

We also find no evidence to show that appellees have been relegated to a position of political powerlessness.[19] Appellees assert that their political powerlessness is apparent by the passage of the PSFA which operates against them. This is a circular argument which we refuse to adopt; to do otherwise, would extend the "politically powerless" designation to any group alleging that certain legislation disfavors them.

■■■ Lastly, we find that wealth alone is not a suspect classification in Colorado. The Colorado Constitution does not forbid disparities in wealth, nor does it forbid persons residing in one district from taxing themselves at a rate higher than persons in another district. As a primary result of this, we have steadfastly refused to impose strict scrutiny review to actions implementing economic or social policy. *See Johnson v. Division of Employment,* 191 Colo. 38, 550 P.2d 334 (1976); *Harding v. Industrial Commission,* 183 Colo. 52, 515 P.2d 95 (1973). *See also United States v. Kras, supra; Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 90

S.Ct. 1153, 25 L.Ed.2d 491 (1970). We reaffirm our adherence to that principle today.

Accordingly, we find that appellees fail to satisfy the requisite elements constituting an identifiable "class"; that they do not meet the traditional features of suspectness; and that wealth alone will not create a suspect classification in Colorado.

C. . *Rational Basis Standard of Review*

Having concluded that no suspect class or fundamental right is involved, the remaining step in equal protection analysis is to determine whether the Colorado public school finance system rationally furthers a legitimate state purpose. *See Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).[20]

■■■ In instances such as this, a statutory classification is entitled to the usual presumption of validity with the individual bringing the attack having the burden of showing that it fails to rationally further any legitimate state purpose. *Harding v. Industrial Commission, supra.* Additionally, under the rational basis test, we are obligated to uphold any classification based on facts which can reasonably be conceived as supporting the action. *See Rodriguez, supra; Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Henninger v. Charnes, supra; Fritz v. Regents of University of Colorado, supra.*

■■■ The first task is to identify the legitimate state purpose which this legislation purportedly furthers. Here, the General Assembly has not expressly declared what the objective of the school finance system is; however, appellants and intervenor-appellants advance the argument that the objective is that of local control.[21] That is, control of the locally elected school board

---

found in *Rodriguez, supra,* at 411 U.S. at 53 nt. 109, 93 S.Ct. at 1307 nt. 109.

**19.** The political powerlessness of a group was evident in *Hobson v. Hansen,* 269 F.Supp. 401 (D.D.C.1967) *aff'd sub nom. Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175 (D.C.Cir. 1969), where a racial minority group was effectively excluded from equal participation in the political process. *See also Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

**20.** *Cf. Board of Education, Levittown, Etc. v. Nyquist,* 83 A.D.2d 217, 443 N.Y.S.2d 843 (1981), (App.Div., filed October 26, 1981) (where the New York Court applied the intermediate level of review in their equal protection analysis).

**21.** Appellant's brief at 61; Intervenor-Appellant's brief at 139.

by the voters in the district. Such control is exercised by influencing the determination of how much money should be raised for the local schools, and how that money should be spent.

We agree with this interpretation for although the objective of local control is not explicit within the school finance system itself, we find it apparent upon reviewing the history of Colorado's educational system along with selected constitutional provisions and interpretative case law. *See, e.g., Colo. Const.* Art. IX, Sec. 15 (schools to be controlled and directed by local school district directors); *Colo.Const.* Art. IX, Sec. 16 (the General Assembly and state board of education are prohibited from prescribing textbooks for the schools); *People ex rel. Vollmar v. Stanley, supra,* (parents have inherent civil right to exercise control over the education of their children).

Thus, since local control is the objective of Colorado's school finance system, the remaining question is whether such objective is rationally furthered by this system.

■■■■ Every statute is presumed constitutional unless proven beyond a reasonable doubt to be constitutionally invalid. *Turner v. Lyon,* 189 Colo. 234, 539 P.2d 1241 (1975). We find that utilizing local property taxation to partly finance Colorado's schools is rationally related to effectuating local control over public schools. The use of local taxes affords a school district the freedom to devote more money toward educating its children than is otherwise available in the state-guaranteed minimum amount. It also enables the local citizenry greater influence and participation in the decision making process as to how these local tax dollars are spent. Some communities might place heavy emphasis on schools, while others may desire greater police or fire protection, or improved streets or public transportation. Finally, local control provides each district with the opportunity for experimentation, innovation, and a healthy competition for educational excellence. *See Rodriguez, supra.*

■■■■ Although we recognize that due to disparaties in wealth, the present finance system can lead to the low-wealth district having less fiscal control than wealthier districts, this result, by itself, does not strike down the entire school finance system. *See McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1110, 6 L.Ed.2d 393 (1961); *Rodriguez, supra.* Indeed, a legislative scheme may not be condemned simply because it does not effectuate the state's goals with perfection. *Dandridge v. Williams, supra.*

■■■■ Although all educational financing cases are *sui generis* in the sense that the alleged deprivation is relative rather than absolute, here, we find no discrimination, invidious or otherwise, in a system that applies a uniform subsidy formula on a statewide basis, while concurrently promoting community control by means of local taxation.

■■■ Accordingly, we find the PSFA to be constitutional as rationally related to a legitimate state purpose.

We also hold that the statutorily imposed 4-mill levy restriction prescribed for the capital reserve fund, section 22–40–102(4), C.R.S.1973 (1980 Supp.) and the 20% limit on the valuation for assessment of the taxable property for the bond redemption fund, section 22–42–104(1)(a), C.R.S.1973 (1980 Supp.), are also rationally related to legitimate state purpose, and are therefore declared constitutional.

The capital reserve fund restriction and the bond redemption fund limitation are not accompanied by any legislatively declared purpose. However, an analysis of the school finance system demonstrates that these restrictions or limitations are an important part of the state's system of financing public services and that they are rationally related to the goals sought to be achieved.

■■■ Limitations upon public indebtedness and spending are constitutionally authorized and imposed in Article XI, Sections 3, 5 and 6 of Colorado's Constitution. Here, the statutory restrictions or limitations as

to both funds are tied to the taxable property valuation in each school district, and serve as an outer limit to the district's taxing authority. *See also* section 31–15–302(1)(d), C.R.S.1973 (indebtedness incurred by governing body of municipality shall not exceed three percent of the actual value of the municipality's taxable property); section 32–1–1101(1)(a), C.R.S.1973 (1981 Cum. Supp.) (restricts the tax levy imposed in Special Districts to not more than, (I) eight mills for fire protection districts, (II) two mills for hospital districts, and (III) four mills for park and recreation districts). The legislative prerogative of controlling the outer limits of any agency's taxing authority involves a legitimate and wholly rational state purpose. The purpose of such limitations is essentially to prevent the present pledging of future public funds. *See In re Interrogatories by Colo. State Senate*, 193 Colo. 298, 566 P.2d 350 (1977); *In re Senate Resolution No. 2*, 94 Colo. 101, 31 P.2d 325 (1933).

In *City of Trinidad v. Haxby*, 136 Colo. 168, 315 P.2d 204 (1957), this court addressed the issue of constitutionally imposed limitations, and stated:

"If the framers of the Constitution were unnecessarily restrictive in prescribing the constitutional limitation, which many believe was designed to protect the credit of the state and its political subdivisions for the improvident incurring of public debt, the remedy lies with the people who have the power to repeal the limitation at the polls."

*Id.* 136 Colo. at 177, 315 P.2d at 208. We embrace that view again here.

The restrictions and limitations found in the capital reserve fund and the bond redemption fund are rationally related to the legitimate state purpose of controlling the public debt. While we may not agree with these legislative determinations, our role here is to review the validity of this legislative action, not to determine social policy. Accordingly, we find these two provisions constitutionally valid as being rationally related to a legitimate state purpose.

### V. *Article IX, Section 2 of the Colorado Constitution*

The appellees contend that the school finance system violates Article IX, Section 2 of Colorado's Constitution. In relevant part, this constitutional section states: "The general assembly shall . . . provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state. . . ."

Appellees' argument is essentially that the "thorough and uniform" clause requires the state to provide equal educational opportunity to its schoolchildren, and that the present system violates this mandate by creating varying educational opportunities due to revenue differences between the districts.

We have never been called upon to interpret Article IX, Section 2 in any context which would prove helpful to this case although the provision is discussed in many cases.[22] Also, we are unable to find any

**22.** *People v. Y. D. M.*, 197 Colo. 403, 593 P.2d 1356 (1979); *Marshall v. School Dist. RE # 3 Morgan County*, 191 Colo. 451, 553 P.2d 784 (1976); *Denver Ass'n for Retarded Children, Inc. v. School Dist. No. 1, In the City and County of Denver*, 188 Colo. 310, 535 P.2d 200 (1975); *Pacheco v. School Dist. No. 11 of El Paso County*, 183 Colo. 270, 516 P.2d 629 (1973); *Game and Fish Commission v. Feast*, 157 Colo. 303, 402 P.2d 169 (1965); *Board of Education of State of Colorado v. Spurlin*, 141 Colo. 508, 349 P.2d 357 (1960); *Simonson v. School Dist. No. 14*, 127 Colo. 575, 258 P.2d 1128 (1953); *Hazlet v. Gaunt*, 126 Colo. 385, 250 P.2d 188 (1952); *School Dist. No. 26 in Gunnison County v. Hards*, 112 Colo. 319, 149 P.2d 651 (1944); *Zavilla v. Masse*, 112 Colo. 183, 147 P.2d 823 (1944); *Cline v. Knight*, 111 Colo. 8, 137 P.2d 680, 146 A.L.R. 1281 (1943); *Wilmore v. Annear*, 100 Colo. 106, 65 P.2d 1433 (1937); *Fangman v. Moyers*, 90 Colo. 308, 8 P.2d 762 (1930); *Duncan v. People ex rel. Moser*, 89 Colo. 149, 299 P. 1060 (1931); *Hotchkiss v. Montrose County High School Dist.*, 85 Colo. 67, 273 P. 652 (1928); *People ex rel. Vollmar v. Stanley, supra; Hallett v. Post Printing & Publishing Co.*, 68 Colo. 573, 192 P. 658, 12 A.L.R. 919 (1920); *Chicago, B & Q. R. Co. v. School Dist. No. 1 in Yuma County*, 63 Colo. 159, 165 P. 260 (1917); *School District No. 16 v. Union High School No. 1*, 60 Colo. 292, 152 P. 1149 (1915); *Schwartz v. People*, 46 Colo. 239, 104 P. 92 (1909); *In re Kindergarten Schools*, 18

historical background to glean guidance regarding the intention of the framers.

Nonetheless, this court has previously found that the term "thorough and uniform" does not require complete equality in the sense of providing free textbooks to all students. *Marshall v. School District RE # 3 Morgan County*, 191 Colo. 451, 553 P.2d 784 (1976). We have also found that the word "uniform" means a pupil residing in a district without a high school is entitled to attend a high school in another district at the former district's expense. *Duncan v. People ex rel. Moser*, 89 Colo. 149, 299 P. 1060 (1931); *Hotchkiss v. Montrose County High School Dist.*, 85 Colo. 67, 273 P. 652 (1914). However, we have never interpreted this constitutional provision to require equal expenditures within the districts.

 We find that Article IX, Section 2 of the Colorado Constitution is satisfied if thorough and uniform educational opportunities are available through state action in each school district. While each school district must be given the control necessary to implement this mandate at the local level, this constitutional provision does not prevent a local school district from providing additional educational opportunities beyond this standard. In short, the requirement of a "thorough and uniform system of free public schools" does not require that educational expenditures per pupil in every school district be identical.

 We hold that Colorado's present school financing system does not violate the "thorough and uniform" mandate.[23] We note that this mandate is particularly implemented by the following statutes. Section 22–30–101 *et seq.*, C.R.S.1973 (one class of school districts is created); section 22–32–101 *et seq.*, C.R.S.1973 (creating a uniform system of governance for those districts); section 22–60–101 *et seq.*, C.R.S. 1973 (creating a uniform teacher certification program); section 22–33–101 *et seq.*, C.R.S.1973 (insuring the general availability of the public school program); and, section 22–50–101 *et seq.*, C.R.S.1973 (establishing a uniform system of school finance).

 While it is clearly the province and duty of the judiciary to determine what the law is, *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the fashioning of a constitutional system for financing elementary and secondary public education in Colorado is not only the proper function of the General Assembly, but this function is expressly mandated by the Colorado Constitution. *Colo.Const.* Art. IX, Sec. 2. Thus, whether a better financing system could be devised is not material to this decision, as our sole function is to rule on the constitutionality of our state's system. This decision should not be read to indicate that we find Colorado's school finance system to be without fault or not requiring further legislative improvements. Our decision today declares only that it is constitutionally permissible.

The judgment of the district court is reversed.

ERICKSON, J., specially concurs.

DUBOFSKY and LOHR, JJ., dissent.

QUINN, J., does not participate.

ERICKSON, Justice, specially concurring:

As the majority opinion implies, the Colorado school finance system is not without fault and should be revised by the General Assembly to correct the disparity in the educational opportunities which are available in the different counties and school districts in Colorado. The fact that a bare majority of the justices reviewing this case has concluded that the present system meets the minimum standards of equal protection under the United States and Colorado Constitutions should not be interpreted

---

Colo. 234, 32 P. 422 (1893); *People v. Commissioners*, 12 Colo. 89, 10 P. 892 (1883).

**23.** For a thorough presentation of the education clauses in other states which are similar or identical to Colorado's "thorough and uniform" requirement, *see Pauley v. Kelley*, 255 S.E.2d 859 (W.Va.1979).

as an approval of the statutory plan. The issue of whether the school financing plan squares with the more definitive requirements of Article IX, section 2 of the Colorado Constitution is even more difficult.

The findings and conclusions of the trial judge, which Justice Lohr has reviewed in his dissenting opinion, arguably support his conclusion that Colorado's present school financing system does not pass constitutional muster. Justice Dubofsky's dissent emphasizes her view of the infirmities of the statutory restrictions and limitations on school district capital expenditures, and again points out the manner in which she believes the present legislative plan is in conflict with the plain wording of Article IX, section 2 of the Colorado Constitution. Both dissenting opinions fairly and accurately detail valid reasons for the General Assembly to formulate amendments to the school financing plan to correct its deficiencies. In concurring with the majority opinion, I do no more than to express my opinion that the statutes in issue, when granted a presumption of constitutionality, barely meet constitutional standards.

I agree with the majority's conclusion that the right to education should not be classified as a fundamental right which compels the State, for the purposes of school financing, to wipe out local entities and finance on the basis of revenues raised by some type of state-wide system. As Justice Powell stated in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973): [1]

> "[I]f local taxation for local expenditures were an unconstitutional method of providing for education then it might be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such a severe denigration of local property taxation

and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live." 411 U.S. at 54, 93 S.Ct. at 1307–08, 36 L.Ed.2d at 55.

In enacting laws such as the school finance system, the legislature must be free to remedy parts of a problem, or to recognize degrees of a problem and to formulate solutions in the areas it determines to be more in need or more readily corrected than others. *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975).

We have, in several instances, recognized that the legislature is granted plenary power in the field of public education. *See, e.g., Marshall v. School District RE # 3*, 191 Colo. 451, 553 P.2d 784 (1976); *Denver Ass'n Retarded Children, Inc. v. School District No. 1*, 188 Colo. 310, 535 P.2d 200 (1975); *Pacheco v. School District No. 11*, 183 Colo. 270, 516 P.2d 629 (1973). Indeed, Art. IX, sec. 2 of the Colorado Constitution charges the General Assembly with the duty to provide a state system for public school financing. Therefore, I would not, under the rational basis test for equal protection, substitute our judgment for that of the legislature in this difficult area without giving it an opportunity to correct the deficiencies presently inherent in the system. Colorado's system for financing public education, as a whole, is not the result of a haphazard approach by the General Assembly, but has been developed through decades of experience in Colorado and elsewhere. As the United States Supreme Court declared in *Rodriguez*:

> "The Texas plan is not the result of hurried, ill-conceived legislation. It certainly is not the product of purposeful discrimination against any group or class. On the contrary, it is rooted in decades of

---

1. *Rodriguez* was a 5–4 opinion which reflects the same type of division which our Court has

evidenced in announcing this opinion.

experience in Texas and elsewhere, and in major part is the product of responsible studies by qualified people. In giving substance to the presumption of validity to which the Texas system is entitled, it is important to remember that at every stage of its development it has constituted a 'rough accommodation' of interests in an effort to arrive at practical and workable solutions. One also must remember that the system here challenged is not peculiar to Texas or to any other State. In its essential characteristics, the Texas plan for financing public education reflects what many educators for half a century have thought was an enlightened approach to a problem for which there is no perfect solution. We are unwilling to assume for ourselves a level of wisdom superior to that of legislators, scholars, and educational authorities in 50 States, especially where the alternatives proposed are only recently conceived and nowhere yet tested." 411 U.S. at 55, 93 S.Ct. at 1308, 36 L.Ed.2d at 55–56. (Citations omitted.)

The difference in quality between two schools cannot be determined simplistically by examining only the differences in per-pupil expenditures. *See, e.g., Thompson v. Engelking, supra; Northshore School District No. 417 v. Kinnear,* 84 Wash.2d 685, 530 P.2d 178 (1974). The decision of the trial court in this case rests upon the conclusion that money is the basic and overriding criterion for adequate education. It is basic that funds must be supplied to provide for teachers, support staff, physical facilities, texts, supplies, transportation, and the myriad of other necessities in today's public educational system. However, I cannot adopt the premise that unless an identical amount of funds is expended per pupil throughout the state, students in those districts receiving less than the district with the greatest expenditure per student are automatically denied equal educational opportunities. *See also Thompson v. Engelking, supra.* Cf. *Serrano v. Priest,* 5 Cal.3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601 (1971).

Moreover, I do not believe that Art. IX, sec. 2 of the Colorado Constitution guaran-tees to the children of this state a right to be educated in such a manner that all services and facilities are identical throughout the State. In my view, such a centralized system of education is not required by either the Colorado or United States Constitutions.

Stated simply, Art. IX, sec. 2 is a mandate to the State through the legislature to establish a complete and uniform system of public education for Colorado elementary and secondary school students. It provides:

"The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously. One or more public schools shall be maintained in each school district within the state, at least three months in each year; any school district failing to have such school shall not be entitled to receive any portion of the school fund for that year."

On its face, this section mandates action by the legislature. It does not establish education as a basic fundamental right. Nor does it dictate a central state system of identical expenditures per student. Partial funding of our public schools with local property taxes does not itself deprive Colorado's educational system of those constitutional qualities which the constitutional draftsmen described as thorough and uniform. As the Washington Supreme Court has succinctly stated:

"A *general and uniform system,* that is, a system which, within reasonable constitutional limits of equality, makes ample provision for the education of all children, cannot be based upon exact equality of funding per child because it takes more money in some districts per child to provide about the same level of educational opportunity than it does in others. Thus, the record shows that all states of the Union, except Hawaii, recognize that taxable property values per pupil vary

among the districts because expenditures per pupil vary, too. Uniformity of size and property values among school districts is not ... essential, we think, to a general and uniform system."

\* \* \* \* \* \*

"A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade—a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education." (Emphasis in original.) *Northshore School District v. Kinnear*, 530 P.2d at 202.

I agree with the analysis set forth by the Washington Supreme Court. Merely because the various school districts in this State vary in size and tax base does not, in my view, necessitate a finding that our entire system of public education is not thorough and uniform under the provisions of the Colorado Constitution.

For the above reasons, I would not overturn the present system used in Colorado to finance public education on constitutional grounds, but would strongly urge the General Assembly to review the school financing system with an eye to correcting the weaknesses in the plan which have been so well-described in the dissenting opinions. Since I do not believe that the defects in the funding system cause the legislative plan to be unconstitutional, I concur with the majority opinion of the Court.

DUBOFSKY, Justice, dissenting:

I write separately to set out in some detail my conclusion that the state limitations on funding of school district capital expenditures violate equal protection of the laws and the requirement of *Colo.Const.*

Art. IX, § 2 that the state provide a "thorough and uniform system of free public schools."

Capital expenditures are large-scale expenses of school districts not included in day-to-day operating costs and encompass such one-time expenditures as construction of new schools, alterations and improvements to existing school structures, and the purchase of classroom furniture and school buses. School districts finance capital expenditures principally in two ways. One is through a special tax levy, the funds from which are placed in a capital reserve fund authorized under section 22–45–103(1)(c), C.R.S.1973. Under section 22–40–102(4), C.R.S.1973, this special levy may not exceed four mills in any year. The other method of financing capital outlays is through bonded indebtedness. Under section 22–42–104(1)(a), C.R.S.1973, the bonded indebtedness of each school district may not exceed 20% of the value of taxable property in that district. Under section 22–42–102(1), C.R.S.1973, a school bond must be approved by a majority of voters in a school district. Bonds are redeemed by another special levy, the proceeds of which are placed in a bond redemption fund. The bond redemption and capital reserve funds are funded solely through local levies. The state provides no funding to local school districts for capital outlays.

The district court found and the majority recognizes that high-wealth districts can raise more revenue from levying the statutory maximum of four mills than low-wealth districts can. Similarly, higher taxable property value enables high-wealth districts to raise more money for capital improvements without exceeding the 20% indebtedness ceiling. The majority finds that the capital outlay financing scheme, including the four-mill levy limitation and the 20% debt ceiling, does not violate equal protection because the components of the scheme are rationally related to the legitimate state purpose of "controlling the public debt." The majority also finds that the scheme does not violate *Colo.Const.* Art. IX, § 2. I disagree. Because the levy and debt

limitations effectively prevent poorer districts from raising adequate funds for capital expenditures and because the majority enunciates no legitimate state purpose furthered by the limitations, I think they violate equal protection guarantees. In addition, I conclude that the state's failure to provide any mechanism for mitigating the vast disparities in school districts' abilities to finance capital expenditures, combined with the funding limitations, violates the requirement of Article IX, § 2 of the Colorado Constitution that the state provide a thorough and uniform system of education.

The majority determines that all aspects of school financing at issue in this case need only bear some rational relationship to a legitimate state interest. According to the majority, this Court is not justified in employing some level of enhanced scrutiny in evaluating any part of the state school financing scheme, because none of its aspects either abridge a fundamental right or classify individuals on the basis of a suspect criterion. In determining that the school financing laws do not impose an unconstitutional classification on the basis of wealth despite the admitted variations between high- and low-wealth school district expenditures per pupil, the majority relies on the U. S. Supreme Court's analysis in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (*Rodriguez*). In *Rodriguez*, the Supreme Court acknowledged that in prior decisions it had applied strict scrutiny in reviewing wealth-based classifications, but only in those cases where, "[b]ecause of their impecunity, members of the affected group were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." 411 U.S. at 20, 93 S.Ct. at 1289. *See Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2108, 26 L.Ed.2d 586 (1970) (incarceration of defendants unable to pay fine ruled unconstitutional); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (indigent defendants have right to court-appointed counsel on direct appeal); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (indigent defendant entitled to transcript on appeal). *Rodriguez* contrasted this line of cases with challenges to wealth-based classifications brought by poor individuals on whom a designated fine or fee merely imposes a heavier burden. The Court in *Rodriguez* concluded that, because the challenge to the Texas school finance system did not allege an "absolute" deprivation of education to poorer districts, enhanced scrutiny was not mandated.

The Supreme Court in *Rodriguez* left open the question whether a state imposed limitation on a school district's ability to levy for educational expenditures which in fact prevented a district from raising adequate funds would constitute a wealth-based classification subject to enhanced scrutiny under equal protection. For example, the Court in *Rodriguez* indicated that a Texas statutory provision establishing a maximum levy of $1.50 per $100 of assessed valuation for school maintenance might present a constitutional question, but that since the plaintiff school district's levy was barely one-third of the maximum allowed, the Court was not required to decide the issue. 411 U.S. at 50, n. 107, 93 S.Ct. at 1305, n. 107.

The majority of Colorado school districts are already levying at the four-mill limit, with the number increasing yearly, and the record here establishes that low-wealth districts have difficulty funding capital expenditures. For example, in 1977, Frisco school district, with a capital reserve levy of four mills, raised $386.52 per pupil, while South Conejos school district, with the same four-mill levy, raised only $23.60 per pupil. In 1978, 136 of the 181 school districts in Colorado levied the statutory maximum of four mills. Of the sixteen plaintiff school districts, thirteen levied the maximum of four mills. Similarly, the debt ceiling results in widely disparate abilities of school districts to raise money through issuance of bonds. For example, South Conejos school district with 782 students had a debt ceiling of $935,020 for 1977 and $954,452 for 1978.

Granby school district with 838 students had a debt ceiling of $8,173,380 for 1977 and $8,833,818 for 1978. Thus, Granby's debt ceiling was approximately nine times that of South Conejos.

At trial, an educational finance economist testified that a lower-wealth district, which would be able to generate only a fraction of the capital financing from the four-mill levy as compared with a high-wealth district, would be unlikely to provide for its long-term capital outlay needs. The debt ceiling presents identical problems. For example, Douglas County school district has issued bonds for school construction up to the 20% limit and cannot issue additional bonds, even if authorized by a majority vote, until assessed valuation increases. Given the 20% limitation, the district's 1980 assessed valuation of property, $120 million, would have to increase to $1.1 billion in order to allow bond-financed funds of $220 million estimated to be the cost for construction of schools to accommodate the influx of population within its boundaries. It is unlikely that the assessed valuation of property in Douglas County will reach necessary levels in time to provide for new school construction, and since the district is already assessing the maximum levy of four mills, it has no means of funding additional capital expenditures.

Capital financing limits represented by the four-mill levy limitation and the 20% debt ceiling inhibit low-wealth school districts from providing adequate replacements for aging facilities or meeting changes in educational emphasis. Moreover, rising costs alone threaten the ability of these districts to provide adequate capital outlays. In 1973, the average capital reserve fund levy was 1.79 mills. In 1977, it was 3.52; in 1978, 3.67; and in 1980, it was 3.70. The number of districts levying taxes at the four-mill maximum increases each year as capital expenses increase at a rate faster than assessed valuation.

I conclude that the levy and bond limitations in Colorado's statutes, together with the failure to provide any mechanism for correcting the resulting disparities among school districts, in effect constitute an absolute deprivation of educational opportunity to students in poorer school districts which would justify the employment of an enhanced level of scrutiny, requiring at least that the financing limitations bear a substantial relationship to important governmental objectives. See *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Rodriguez*, 411 U.S. at 98, 93 S.Ct. at 1329 (Marshall, J., dissenting). I believe that the majority has failed even to demonstrate that the limitations rationally further any legitimate state interest, as required under lower-level scrutiny. The majority certainly has failed to justify the limitations under a more demanding constitutional standard.[1]

The majority recognizes that neither limitation was accompanied by any legislatively declared purpose and asserts that these limitations "are an important part of the state's system of financing public services and . . . are rationally related to the goals sought to be achieved." To the extent that both provisions limit, directly or indirectly, annual property tax levies, the majority analogizes these limitations to the levy restrictions in section 32–1–1101(1)(a), C.R.S. 1973 (1981 Supp.) on fire protection, hospital, and park and recreation districts. The

---

1. My conclusion that the capital finance limitations work an absolute deprivation of educational opportunity on students in poorer school districts leads me to conclude that even under the U. S. Supreme Court's analysis in *Rodriguez*, which would not accord education the status of a fundamental right, these capital limitations would be entitled to enhanced scrutiny. Justice Lohr, in his well-reasoned dissent, would subject all aspects of school financing to an enhanced level of scrutiny based on the "favored status explicitly accorded education in this state." His analysis is independent of *Rodriguez* and is founded on this Court's ability to interpret equal protection rights under the Colorado Constitution differently from the U. S. Supreme Court's analysis under the U. S. Constitution. I concur in Justice Lohr's analysis, which would constitute an independent basis for invalidating the capital finance provisions. I also agree with his conclusion that *all* aspects of Colorado's school finance scheme would fail to satisfy a heightened level of scrutiny.

majority then concludes that "controlling the outer limits of any agency's taxing authority" is tied to the purpose of preventing "the present pledging of future public reserves." This rationale does not relate to the four-mill levy limitation, which involves the collection of present revenues, not the pledging of future ones, and the majority provides no other justification for the levy limitation.

In seeking to supply a rationale for the bonded indebtedness limitation, the majority merely cites cases concerning debt limitations on the state and municipalities. *See In re Interrogatories by Colo. State Senate*, 193 Colo. 298, 566 P.2d 350 (1977); *City of Trinidad v. Haxby*, 136 Colo. 168, 315 P.2d 209 (1957). None of the cases cited explain the school district debt limitation, nor does the majority explain how the reasoning of these cases can be generalized to justify this limitation.

If the guarantee of equal protection of the law means anything, it must mean that citizens are to be protected from arbitrary classifications which affect important interests. The majority supplies no basis for asserting that the levy and debt limitations are not wholly arbitrary. The limits on the districts' ability to tax and incur debt are based not on the needs of a district, but on the amount of assessed valuation in the district. Thus, wealthy districts, whose spending is more than adequate to satisfy capital needs, are not precluded from raising additional funds, while poorer districts, which may have only the barest of funds to spend on capital items, are precluded from raising additional money.

Moreover, the levy limitations subvert the state's purported interest in local control which the majority found as the underlying legitimate state end achieved by the school finance provisions for current operating expenditures. Clearly, the state-imposed four-mill limit prevents localities from an unrestricted determination of the level of taxation necessary to further desired educational goals. With respect to bonded indebtedness, section 22–42–102(1) requires that any school bond be approved by a majority of the district's voters. Yet the debt limitation provision would preclude the issuance of bonds in excess of 20% of the value of the district's taxable property, even if a majority of the electorate approved the bond issue. This cannot be squared with the goal which the majority asserts is furthered by the state's financing system of affording "a school district the freedom to devote more money toward educating its children than is otherwise available [by] the state guaranteed minimum amount," and enabling "the local citizenry greater influence and participation in the decision making process" regarding educational expenditures. Maj. op. at 1023.

Since the majority opinion articulated no legitimate basis for the levy limitation and debt ceiling, I conclude that the capital expense limitations fail to satisfy even the lenient rational relation test employed by the majority. Of course, were a more stringent level of scrutiny employed, these provisions would fail that test as well.

I also disagree with the majority's conclusion that the capital outlay provisions do not violate Article IX, § 2 of the Colorado Constitution. The state's failure to ameliorate the disparity in the ability of different school districts to raise funds for capital outlays, while exacerbating the effect of these disparities through the levy and debt limitations, violates the constitutional requirement that the state "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state. . . ."

The wide disparities in capital outlay funding are manifest from the trial court's findings. In 1977, those school districts in the top 10% of assessed valuation per pupil imposed a capital reserve fund levy of 3.51 mills, which yielded an average of $254.79 per pupil or $72.59 per pupil per mill. By contrast, districts in the bottom 10% in assessed valuation per pupil levied at a rate of 3.50 mills and raised an average of $28.68 per pupil, or $8.01 per pupil per mill. Similarly, low-wealth districts have higher bond redemption tax rates than high-wealth districts, but produce far less revenue per pu-

pil. In 1977, the school districts in the top 10% of assessed valuation per pupil imposed an average bond redemption levy of 3.33 mills for an average yield of $206.81 per pupil, or $62.11 per pupil per mill. School districts in the bottom 10% levied at an average rate of 8.04 mills for a yield of $61.62 per pupil or $7.66 per pupil per mill.

Other states, faced with similar disparities, have intervened to equalize the capacity of districts to finance capital expenditures. Colorado is one of only 14 states which provide no capital funding to local school districts. Expert testimony at trial indicated that there is general agreement among school financing experts that states should be involved in assessing districts' capital needs and funding these needs, effectuating a distribution of the burden for financing school capital outlays across district lines. For example, in New York, the state provides 49% of capital expenditures for districts of average wealth and proportionately more aid, up to a limit of 90% of the cost of a particular facility, to low-wealth districts.

Again, no rational basis exists for the state's failure to intervene. It cannot be justified on the basis of enhancing local control, since the levy and debt ceilings limit local autonomy in this area of school finance. The capital financing scheme and the state's failure to remedy existing inequities violate even the majority's formulation of the requirement of Art. IX, § 2, which finds the constitution satisfied "if thorough and uniform educational opportunities are available *through state action* in each school district." Maj. op. at 1025 (emphasis added). Not only has the state failed to meet its obligation to insure this level of opportunity, but through the debt and levy limitations, it has made its attainment impossible in some districts.

Because of my conclusion that the capital financing provisions violate the constitutional guarantee of equal protection and the thorough and uniform guarantee of Article IX, § 2 of the Colorado Constitution, I would affirm the trial court's ruling striking down this portion of the Colorado school financing system. In addition, I concur with Justice Lohr's conclusion that the Colorado public school financing scheme as a whole violates the Colorado Constitution. *See* n.1, *supra* at p. 6.

LOHR, Justice, dissenting:

The majority finds no constitutional flaw in Colorado's statutorily-created system of financing public elementary and secondary education, and reverses the judgment of the trial court. My analysis of the relevant statutes leads me to the conclusion that they fail to accord equal protection of the laws to all Colorado schoolchildren, contrary to *Colo.Const.* Art. II, § 25, and do not establish a "thorough and uniform" system of public schools throughout Colorado, as mandated by *Colo.Const.* Art. IX, § 2. Therefore, I respectfully dissent.

I.

Colorado's school finance system, as relevant here, is comprised of the Public School Finance Act of 1973 (PSFA), section 22–50–101 *et seq.*, C.R.S.1973 and 1981 Cum.Supp., and those provisions relating to the capital reserve fund, sections 22–40–102(4) and 22–45–103(1)(c), C.R.S.1973 and 1981 Cum. Supp., and to the bond redemption fund, sections 22–42–104(1)(a) and 22–45–103(1)(b), C.R.S.1973 and 1981 Cum.Supp. An analysis of those statutes and of their effect in operation persuades me that, collectively, they violate the requirement of equal protection of the laws under *Colo. Const.* Art. II, § 25. An inquiry into the appropriate equal protection standard to be applied, followed by a summary of the statutory framework for Colorado's school financing system and of the practical operation of that system will demonstrate the reasons for this conclusion.

A.

The United States Supreme Court has held that education is not a fundamental right for the purpose of equal protection under the Fourteenth Amendment to the Constitution of the United States. *San Antonio Independent School District v. Rodri-*

*guez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh. denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973) (*Rodriguez*). In *Rodriguez* the Court went on to hold that Texas' plan for financing public education satisfies equal protection standards because it rationally furthers a legitimate state purpose or interest.

As the majority recognizes, *Rodriguez* does not establish the degree of importance to be attached to education in an equal protection analysis under the Colorado Constitution. The ultimate responsibility for that determination rests with this Court. *See, e.g., People v. District Court*, 165 Colo. 253, 439 P.2d 741 (1968). In exercising that responsibility, however, the majority holds that laws impinging on the right to education require no more attentive scrutiny under *Colo.Const.* Art. II, § 25 than *Rodriguez* accorded them for Fourteenth Amendment equal protection purposes. In reaching that conclusion the majority rejects the test for constitutional fundamentality that led the United States Supreme Court to conclude that education is not a fundamental right for federal constitutional purposes, but does not tell us what test is to be applied for this purpose in Colorado.[1] As a result we cannot determine how it arrived at its conclusion that a rational relationship to a legitimate state purpose is sufficient to justify disparate treatment of educational rights of different classes of schoolchildren in Colorado. I disagree with the majority's analysis and with its conclusion.

1. In n.7 of its opinion the majority says "(F)undamental rights are essentially those rights which have been recognized as having a value essential to individual liberty in our society." The majority does not make explicit whether this test is meant to state a Colorado constitutional standard. In any event it makes no use of this test in the analysis leading to its conclusion that the right to education is non-fundamental.

2. Justice Marshall, in dissent, makes the point that this formulation of the test is too narrow to explain the United States Supreme Court's holdings that the right to procreate, the right to vote in state elections, and the right to appeal from a criminal conviction enjoy protection against discriminatory state treatment. 411

Justice Powell's opinion for the five-justice majority in *Rodriguez* focuses on the importance of adoption of a principled and constitutionally-based test for determination of the importance of rights for equal protection purposes. The opinion states:

> It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is "fundamental" is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. [Citations omitted.][2]

411 U.S. at 33–34, 93 S.Ct. at 1297, 36 L.Ed.2d at 43. Noting that education is not among the rights explicitly protected by the United States Constitution, and finding no basis for saying it is implicitly guaranteed, the Court was led to the conclusion that under the federal constitution the right to education is not fundamental. Thus, scrutiny of the Texas plan was limited to determining whether it rationally furthers a legitimate state interest. A review of the Colorado Constitution reflects the more favored status explicitly accorded to education in this state and leads to the conclusion that legislation not according equal rights to education to all classes must be tested by a heightened standard of review.[3]

U.S. at 100, 93 S.Ct. at 1331, 36 L.Ed.2d at 82. Others have criticized the test as too broad. *See, e.g., Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273, *cert. denied sub nom. Dickey v. Robinson*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

3. The majority notes, and correctly so, that the Colorado Constitution "is not a grant of power to the legislature, but that the legislature is invested with plenary power for all the purposes of civil government, and that the constitution is but a limitation upon that power." *People ex rel. Rhodes v. Fleming*, 10 Colo. 553, 563, 16 P. 298, 303 (1887). *Accord, e.g., People in the Interest of Y. D. M.*, 197 Colo. 403, 593 P.2d 1356 (1979). While the United States

The framers of our constitution were acutely aware of the importance of education in a democratic society, as evidenced by the inclusion of Article IX, § 2 in our original state constitution. That section, which remains unchanged to this day, provides in pertinent part:

> The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously.

The balance of Article IX is devoted to various aspects of the establishment of a public school system in Colorado, including creation of a state board of education (§ 1), administration of the public school fund (§§ 3, 5), compulsory school attendance (§ 11), creation of school districts (§ 15), and denial of any power to the general assembly and the state board of education to prescribe textbooks (§ 16). In a sense, a recognition of the importance of public school was implicit in Colorado's birth as a state of the federal union, for in § 7 of the Enabling Act authorizing the formation of a state government in Colorado the United States Congress granted two sections in every township to the state "for the support of common schools." Act of March 3, 1875, ch. 139, 18 pt. 3 Stat. 474, 475 (1875). A framework for administration of these properties and funds resulting from their sale is established by *Colo.Const.* Art. IX,

§§ 5, 9, and 10. Only three years ago this court explicitly acknowledged the importance which the Colorado Constitution assigns to education in an opinion upholding a compulsory school attendance statute. *People in the Interest of Y.D.M.*, 197 Colo. 403, 593 P.2d 1356 (1979).

Notwithstanding the Colorado constitutional provisions establishing the importance of education, the majority assigns the right to education no enhanced status for equal protection purposes. Thus, it holds that the right to education may be subjected to differential legislative treatment on a showing of only a rational relationship to a legitimate state purpose. I disagree. While we must exercise caution in characterizing rights as "fundamental," and so triggering examination by strict scrutiny, a test most difficult to satisfy, in my view the majority fails to give the effect due to the language of the Colorado Constitution by not according this right a degree of importance greater than an ordinary interest for equal protection purposes.[4]

Equal protection analysis is not so rigid as to establish only two categories of rights—those that are fundamental, and those that are not—and to bring to bear only two tests—strict scrutiny, and minimum scrutiny—to determine the constitutionality of laws impinging unequally on exercise of those rights by different classes of citizens. In dealing with suspect classifications, the United States Supreme Court has concluded that legislative classification on the basis of gender, while not mandating

Constitution is the source of federal governmental powers, which the majority apparently concludes is the basis for characterizing rights explicitly or implicitly recognized in that document as fundamental, the Colorado Constitution extends to matters not deemed fundamental. For that reason, the majority rejects the "*Rodriguez* test" of fundamentality. It does not follow, however, that the degree of importance assigned to a right by Colorado constitutional provisions is irrelevant to fundamentality for equal protection purposes simply because mention of the right in the constitution is not conclusive that it is fundamental. Indeed, it would be difficult to imagine a more reliable indicator of a right's importance than the dignity assigned to it by the State Constitution.

4. Some state courts have found the right to education to be fundamental for the purpose of considering the protections to be accorded this right under their own constitutions. *See Serrano v. Priest*, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); *Pauley v. Kelly*, 255 S.E.2d 859 (W.Va.1979); *Washakie County School District No. One v. Herschler*, 606 P.2d 310 (Wyo.1980), *cert. denied sub nom. Hot Springs School District No. One v. Washakie County School District No. One*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). Additional cases, some holding education to be a fundamental right under a state constitution and others holding to be contrary, are collected at n. 11 of the majority opinion.

strict scrutiny, requires a test more exacting than "rational relationship to a legitimate governmental interest." Thus, in *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), that Court held that a gender-based classification can survive an equal protection challenge only if it serves important governmental objectives and is substantially related to achievement of those objectives. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), *reh. denied*, 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977). Intermediate review standards have also been employed by the United States Supreme Court in other contexts. *See* Justice Marshall's dissent in *Rodriguez*, 411 U.S. at 70, 93 S.Ct. at 1315, 36 L.Ed.2d at 64;[5] *see generally*, *L. Tribe, American Constitutional Law* § 16–31 (1978). We, too, have tested gender-based distinctions by the intermediate standard employed in *Caban v. Mohammed, supra. R. McG. v. J.W.*, Colo., 615 P.2d 666 (1980). In recognition of the substantiality and importance with which the Colorado Constitution invests the right to education, any disparate legislative treatment of that right should be tested for equal protection sufficiency by no less demanding a standard. Applying this test, the Colorado school finance laws cannot withstand critical examination.

### B.

The trial court found that one measure of the quality of an educational program is "the amount of money per pupil spent by a school district on educational offerings to pupils within the district." More specifically, it found:

> The level of expenditures per pupil is directly related to the ability of a school district to provide a measure of educational quality in its curricula and overall program. The quality of educational opportunity provided by school districts to pupils is significantly improved by an increase in per pupil expenditures... *Because of [the] disparities [in educational expenditures among the 181 school districts in Colorado], students in low-wealth, low-spending districts receive an educational opportunity significantly below that offered to students in high-wealth, high-spending districts.*

> The disparities in educational opportunity resulting from corresponding disparities in per pupil expenditures generally are related to such fiscally partisan factors as: (1) class size; (2) teacher quality, especially the teacher's verbal ability to communicate the operative principles of a course of study and their interrelationships; (3) curricular offerings; (4) supportive services, such as counselors and teachers' aides; (5) teaching materials and equipment, including textbooks, libraries, laboratory facilities, media centers, health facilities; and (6) the condition of capital facilities. (Emphasis added.)

Although the majority fails to note these findings and appears to deny the truth of their content, it abandons its legitimate appellate function in doing so. It may be, as the majority asserts, that a "fundamental

---

5. In his dissent in *Rodriguez* Justice Marshall argues convincingly that the United States Supreme Court's approach has been even more flexible: "A principled reading of what this Court has done reveals that it has applied a spectrum of standards in reviewing discrimination allegedly violative of the Equal Protection Clause. This spectrum clearly comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." 411 U.S. at 98–99, 93 S.Ct. at 1330, 36 L.Ed.2d at 81. Justice White's dissent

in *Rodriguez*, ostensibly applying a test of mere rationality, introduces an unaccustomed rigor into that test and serves as an exhibit to support Justice Marshall's "spectrum of standards" reading of the Court's decisions.

Oregon has adopted an approach similar to that suggested by Justice Marshall in evaluating impairment of educational rights under the equal protection clause of its constitution. *Olsen v. State*, 276 Or. 9, 554 P.2d 139 (1976); *see generally, Robinson v. Cahill, supra*, 62 N.J. at 491–92, 303 A.2d at 282 (expressing disapproval of a mechanical approach to the delicate balancing of interests necessary in this context).

disagreement exists concerning the extent to which there is a demonstrable correlation between educational expenditures and the quality of education." However, in this case any such disagreement was resolved by the above-quoted factual findings. The evidence supports these findings, and we are bound by them. *E.g., Petersen v. Ground Water Commission,* 195 Colo. 508, 579 P.2d 629 (1978).

## C.

The majority describes the school finance laws in some detail but neglects to outline the factual findings of the trial court detailing how the financing system operates in practice. When this information is supplied, the failure of the laws to accord equal protection to Colorado schoolchildren becomes apparent. I shall first summarize the structure established by the statutes and then turn to the trial court's findings.

In order to finance Colorado's public school system, the Colorado legislature has adopted a statutory scheme which utilizes funds from both local property taxes and state taxes. Each school district must raise a substantial portion of needed monies for general purposes from local property taxes. These revenues are then supplemented by a state contribution. A maximum amount of revenue per pupil from both sources is prescribed. This maximum limit is called the authorized revenue base. Not limited by this maximum are federal and state contributions, known as "categorical aids," for certain special purposes,[6] and monies raised from local property taxes for capital expenditures. However, separate statutory criteria limit the amount of capital expenditures.

The year 1977 will serve to illustrate the manner in which educational costs are shared. In that year $950,333,000 was spent on public primary and secondary education in Colorado. Local property taxes made up 47% of that amount; state tax revenues provided 43%; federal contributions accounted for 6%; and the other 4% came from miscellaneous sources.

A useful starting point for understanding the school financing system is the authorized revenue base (ARB), the upper limit of per pupil expenditures for general operating expenses.[7] This had its inception in the PSFA, in section 22–50–106, C.R.S.1973 and 1981 Supp. For the 1973 budget year each district was assigned an ARB founded on the 1973 revenues from local property taxes, the 1973 state equalization support under prior legislation, and the 1973 attendance entitlement. These ARBs varied widely among school districts and essentially reflected historical spending levels. Since ARBs limit the operational expenses for each schoolchild, disparities in ARBs are at the heart of the differentials in educational opportunity of which the plaintiff schoolchildren complain.

Complex statutory adjustments have resulted in increases in ARBs over the years but have not erased the disparities, as will be seen. Unless new legislation is enacted, ARBs will increase at a rate of 7% annually in 1983 and subsequent years. Section 22–50–106(2)(f), C.R.S.1973 (1981 Supp.). Since ARBs vary among school districts now, the flat percentage increases will cause further divergence of ARBs in the future. (*I.e.,* 7% of a higher number yields a greater absolute increase than 7% of a lower number.)

A school district may increase its prescribed ARB in one of two ways. First, an increase based on need may be requested of the state school district budget review board. Section 22–50–107, C.R.S.1973 and 1981 Supp. In the alternative, or in the event of budget review board denial, a special school district election may be called to obtain approval of the requested increase. Section 22–50–108, C.R.S.1973 and 1981 Supp. For the first year of any increase

---

**6.** Under Colorado law, "categorical programs" include the education of handicapped children, vocational educational aid, small attendance center aid, and transportation aid. Section 22–50–101.5, C.R.S.1973 (1981 Supp.).

**7.** The number of pupils is determined by a prescribed counting method, the result of which is the "attendance entitlement." *See* section 22–50–104, C.R.S.1973 (1981 Supp.).

authorized by either of these two methods, the funding for the increase must be provided through property taxes within the district, without any state supplemental aid. Sections 22–50–107(2)(b), 22–50–108(4), C.R.S.1973. As will be seen, this first-year financial hurdle substantially inhibits school districts with low assessed property valuations from availing themselves of the procedure to increase their ARBs.

The first source of school district monies is "from levies against the valuation for assessment of all taxable property located within the boundaries of [each] school district." Section 22–40–102(1), C.R.S.1973 (1981 Supp.). In order to accomplish the levy, every year the board of education of each school district must certify to the board of county commissioners of the county in which the school district is located the amount necessary in its judgment to be raised for general funds to defray operating costs for education during the next fiscal year.

The assessed valuations of property and the assessed valuations of property per pupil vary greatly among school districts. In recognition of the difficulty this presents to property-poor school districts in trying to raise necessary funds for public schools, the state has provided two forms of aid: state equalization aid, and a minimum guarantee.

State equalization aid is a method to equalize among districts the power of a one mill tax levy to raise revenue per pupil up to a guaranteed level. In 1977 the state guarantee was $31.92 per mill per pupil. Section 22–50–105(1)(a)(IV), C.R.S.1973 (1981 Supp.). Thus, if a one mill levy on assessed valuation in a school district would not produce $31.92 per pupil in 1977, the state provided equalization aid necessary to supplement the amount which the one mill levy would produce up to the $31.92 guaranteed amount. The total equalization aid to a school district was dependent on the mill levy necessary for that district to generate its assigned ARB for each pupil.

A minimum state contribution, the minimum guarantee, completes the state aid picture. Every year the state pays each district a prescribed amount per mill per pupil without regard to need. In 1977 this was $10.85 per mill per pupil. This amount applies toward the state equalization aid obligation, but is payable in full even if a school district does not need all or any part of it to achieve the state guaranteed level per mill per pupil. For example, in 1977 in a school district where a one mill levy would produce $32.00 per pupil (*i.e.*, more than the $31.92 state guaranteed level) the state would still pay $10.85 per mill per pupil in aid to the district. This contribution operates within the ARB limit and effects a reduction in the mill levy to be imposed in high assessed valuation districts to generate their ARBs.

In addition to the plan for financing school district operational expenses, the Colorado statutes impose limitations on the ability of school districts to spend for capital improvements. Capital expenditures are not limited by the ARB but are considered separately. They are funded entirely through taxation on property within each respective district, without supplementation by state aid. Capital expenditures are financed through capital reserve funds, section 22–45–103(1)(c), C.R.S.1973 and 1981 Supp., and bond redemption funds, section 22–45–103(1)(b), C.R.S.1973. The levy for capital reserve funds is limited to four mills per year. Section 22–40–102(4). The bond redemption funds are financed from local property tax revenues. Sections 22–42–118, 22–45–103(1)(b), C.R.S.1973. Bonded indebtedness is limited to 20% of the latest valuation for assessment of the taxable property in the district. Section 22–42–104(1)(a), C.R.S.1973 (1981 Supp.). As the trial court found, these limitations severely curtail the ability of property-poor districts to raise money for necessary school improvements.

The complexities and interrelationships of school financing components are such that only when the effects of the system are studied can the great disparities in per pupil spending for public school education in Colorado be brought into focus. The trial court made findings of fact which expose

these disparities in harsh relief, and I now turn to those findings.

### D.

The trial court made extensive findings of fact with respect to the manner in which the Colorado public school finance system has operated. Those findings are attached in substantial part as an appendix. They detail the large disparities among school districts in the ability to finance education because of the correspondingly large variations in assessed valuation per pupil. The trial court also points out the large variations in ARBs which have been produced by the statutory formulas and shows that they are rooted, at least in substantial part, in historical spending levels in each district. Historical district spending in turn was influenced by the widely varying assessed valuations per pupil within the districts. In sum, the trial court found that:

> The statutory scheme of public school finance has permitted districts with relatively high assessed valuations per pupil to generate relatively high authorized revenue bases and expenditure levels. On the other hand, districts with relatively low assessed valuations per pupil have relatively low authorized revenue bases and low per pupil expenditure levels.

It also found that the relative ranking of school districts by ARBs has not changed significantly since 1973.

The district court then explored the effect of state equalization aid and minimum guarantee money on a school district's fiscal ability. It found that state equalization aid, with its prescribed maximum per pupil per mill levels, "is simply incapable of equalizing the revenue raising potential of low-wealth [i.e., low assessed valuation per pupil] districts with high-wealth districts." Moreover, it found that the minimum guarantee money increases the disparity in the fiscal ability of school districts to raise revenue for educational purposes because it is awarded to districts without regard to need. Thus, the true measure of the state's equalization efforts is the difference between the state equalization aid limit and the minimum guarantee (e.g., in 1977, $31.92 per pupil per mill minus $10.85 per pupil per mill, a difference of $21.07 per pupil per mill).

Property-poor school districts are inhibited from increasing their ARBs through state school district budget review board authorization or voter approval by the need to finance the total authorized increase in the first year without the assistance of state aid. As the trial court found,

> Although the amount of money raised locally is to some extent the product of the willingness of local residents to tax themselves, as a practical matter school districts with a small tax base simply cannot raise their mill rates to the level necessary to match the authorized revenue bases attainable by the more wealthy districts with less onerous tax efforts on the part of these wealthy districts....
>
> The practical consequence of requiring a low-wealth district to pay for an increase in its authorized revenue base solely out of local tax revenue in the first year of such increase is that the low-wealth district is curtailed, if not outrightly prevented, from pursuing a higher quality educational program for its students and from making significant choices in its curriculum and total educational program.

Likewise, property-poor districts are severely limited in their ability to construct capital improvements by reason of the four mill levy limitation on capital reserve fund accumulations and the 20% of assessed valuation limitation on bonded indebtedness. In 1977, for example, Frisco School District, with a tax levy of 4 mills, raised $386.52 per pupil for its capital reserve fund, while South Conejos School District, for the same 4 mill levy, raised only $23.60 per pupil. The appendix gives other examples and statistics vividly illustrating the differences in the abilities of school districts to construct capital improvements as a result of disparities in the assessed valuation of property within the districts.

Finally, the trial court reviewed the 1977 and 1978 amendments to the Public School Finance Act of 1973 and found that the

authorized revenue base disparities will not be erased or substantially mitigated by the new legislation.

### E.

The trial court found as a matter of fact that "[t]he level of expenditures per pupil is directly related to the ability of a school district to provide a measure of educational quality in its curricula and overall program." It went on to find that "[t]he disparities in educational expenditures among the 181 school districts in Colorado are to a great extent the product of the random historical fortuity of local taxable wealth." This establishes the fact that Colorado's school finance laws do not treat schoolchildren in the various school districts throughout the state equally in the exercise of their right to education. Under the heightened scrutiny standard which I consider appropriate, this differential treatment can survive an equal protection challenge only if it serves important governmental objectives and is substantially related to the achievement of those objectives. Whether it does so is the next inquiry.

The governmental interest which the majority finds sufficient to justify the unequal educational opportunities accorded Colorado schoolchildren is local control.[8] Local control refers to control at the school district level. As the trial court observed, local control has two components: (1) local administrative control, i.e., control over the educational program within the school district, and (2) local fiscal control, i.e., control over the amount of money that will be spent for educational purposes within the school district. Local administrative control is indisputably an important governmental objective—so much so that it finds recognition in Colo.Const. Art. IX, §§ 15 and 16.[9] The assertion that local fiscal control is an important governmental objective also must be given some credence, particularly in view of its relationship to local administrative control.

The equal protection defect in the PSFA and associated capital expenditure limitation statutes is apparent, however, when those statutes are tested to determine whether they are substantially related to the achievement of local control objectives. The trial court found as a fact that in operation the ARBs in low assessed valuation school districts are so low as to make local control an empty concept. It stated:

In many low-wealth districts, including the sixteen districts of plaintiff schoolchildren, there is a lack of any meaningful degree of local fiscal control, with a concomitant lack of local administrative control. The practical consequence of requiring a district lacking in local taxable wealth to pay for an increase in its authorized revenue base solely out of local tax revenue in the first year of such increase is that the low-wealth district is hindered, if not forestalled, in its choice of curricu-

---

8. The appellants also urge that educational needs vary among the districts. The majority does not justify the school financing plan on this basis. Nor could it reasonably do so in view of the following findings of the trial court:

The educational needs of schoolchildren vary to some degree among school districts because of geographical, ecological, social, and economic factors. However, prior to and since the enactment of the Public School Finance Act of 1973, neither the General Assembly nor the Colorado Department of Education has undertaken to formulate the ingredients of a thorough and uniform education for all students throughout the state, either as related to or independent of local needs. Nor has there been undertaken any analysis of what are the variant educational needs of school children throughout the state. Consequently, gross uncertainty exists with respect to the relationship between educational cost

differentials among school districts and the satisfaction of variant educational needs. Both the Public School Finance Act of 1973 and the related statutory structure pertaining to the capital reserve and bond redemption funding fail to define or formulate any overt program substantially related to the satisfaction of the variant needs of school children throughout the state.

9. Colo.Const. Art. IX, § 15 provides in pertinent part, "[The local boards of education] shall have control of instruction in the public schools of their respective districts." By negative implication, Colo.Const. Art. IX, § 16 also treats one aspect of local administrative control: "Neither the general assembly nor the state board of education shall have power to prescribe textbooks to be used in the public schools."

lum and in its pursuit of a qualitative educational program.

Local control as it relates to capital expenditures is operative within a narrow range. A local school district is limited to a four mill assessment per year to contribute to its capital reserve fund and cannot exceed a bonded indebtedness limit of 20% of assessed valuation of property in the district. While these limitations may reflect sound governmental policies limiting burdens on landowner-taxpayers, they create great inequality in moneys per student which may be spent for capital construction. For example, the trial court found that in 1977:

> the districts at the second decile levied at an average capital reserve rate of 3.01 for an average yield of $117.76 per pupil, which is $39.12 per pupil per mill. The districts at the ninth decile levied at an average capital reserve tax rate of 3.67 for an average yield of $40.16 per pupil, which is $10.95 per pupil per mill.

The General Assembly has done nothing to address the inequality in capital facilities funding capabilities that is created by the ceilings on capital reserve fund assessments and bonded indebtedness. In the capital facilities area "local control" is merely a euphemism masking gross inequalities in the abilities of school districts to meet their needs.[10]

The majority holds that the bonded indebtedness ceiling and the limitation on assessments for the capital reserve fund further an additional legitimate state purpose of controlling the public debt. Although the capital reserve fund assessment limitation relates to current assessments and not to debt, the bonded indebtedness ceiling is substantially related to containment of the public debt. I do not dispute that protection of the credit of a school district from

improvidently incurring public debt is a legitimate state purpose. *See City of Trinidad v. Haxby*, 136 Colo. 168, 315 P.2d 204 (1957). I would hold, however, that even if these limitations on revenue collection and debt may properly be isolated from the remainder of the public school financing scheme, they are not supported by governmental objectives so important that their attainment can be permitted to override the right to education, which has enjoyed an important place among the rights of Colorado citizens since statehood. *See People in the Interest of Y.D.M., supra.* Although I might not go quite so far, Justice Dubofsky persuasively argues in her dissent in this case that "the levy and bond limitations in Colorado's statutes, together with the failure to provide any mechanism for correcting the resulting disparities among school districts, in effect constitute an *absolute deprivation* of educational opportunity to students in poorer school districts, ..." (Emphasis added.) Certainly they create egregious inequality in capital facilities financing capacity among the school districts. I would hold that the asserted governmental objective of debt limitation is not sufficiently important to sustain the challenged statutes against that heightened level of equal protection scrutiny that I consider applicable here. *See generally* the quotation from Justice Marshall's dissent in *Rodriguez* at n.5, *supra.*

Concluding that Colorado's public school financing statutes are not substantially related to the achievement of the asserted local control objectives, and that control of the public debt is not a governmental interest of sufficient weight to justify the serious impairment of the educational rights of Colorado schoolchildren effected by the capital reserve fund assessment and bonded indebtedness limitations, I would hold that

---

**10.** The majority's statements about the beneficent results of local control could have been made only by ignoring or casting aside the trial court's findings of fact. The majority states, *e.g.,* "The use of local taxes affords a school district the freedom to devote more money toward educating its children than is otherwise available in the state-guaranteed minimum amount." And, "local control provides each district with the opportunity for experimenta-

tion, innovation, and a healthy competition for educational excellence." The freedom and opportunity so extolled are denied to school districts with low assessed valuations by reason of the lack of funds necessary for their enjoyment, as the trial court so clearly found. The majority's only allusion to this deprivation is to dismiss it as an unimportant deviation from perfection.

these statutes, considered together, deny equal protection of the laws to Colorado schoolchildren.

## II.

There is yet another respect in which Colorado's public school finance laws are constitutionally deficient. Under *Colo. Const.* Art. IX, § 2, the General Assembly has a constitutional duty to establish a school system meeting specified standards:

> The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously.

As the majority notes, we have never before been called upon to determine what is meant by a "thorough and uniform" system of public schools.[11]

The majority appears to hold that the constitutional standard is satisfied if the state insures that some unspecified minimum of educational opportunities is available in each school district.[12] Even overlooking the fact that, as the trial court found, the General Assembly has not addressed the question of the nature of those educational opportunities which would comprise a constitutionally sufficient minimum, I believe more content should be given to the "thorough and uniform" clause.

In construing the word "uniform," recognition must be given to *Colo.Const.* Art. IX, §§ 15 and 16, placing control of instruction in local school boards and forbidding the General Assembly and state board of education from prescribing textbooks for use in the public schools. These provisions dispel any notion that in establishing a "uniform"

system of free public schools the General Assembly must, or even may, prescribe a set curriculum to be implemented in all school districts in the state. Against this background, I agree with the trial court that "[w]hatever might be said of possible constructions of 'thorough' and 'uniform,' it seems evident that the education clause was intended for the benefit of schoolchildren and addresses notions underlying the basic concept of equal educational opportunity." Uniformity requires parity of educational opportunity, not, as the majority indicates, simply an assurance that some bare minimum opportunity is available in each school district.

The assessment of uniformity of educational opportunity in a setting where each school district has a constitutional right to control instruction in its own schools is difficult at best. It is not at all necessary, however, to determine the appropriate constitutional limits on legislative and local school district powers for present purposes. It is enough to note the constitutional implications of the trial court's finding, quoted earlier, but bearing repetition here, that:

> In many low wealth districts, including the sixteen districts of plaintiff schoolchildren, there is a lack of any meaningful degree of local fiscal control, with a concomitant lack of local administrative control. The practical consequence of requiring a district lacking in local taxable wealth to pay for an increase in its authorized revenue base solely out of local tax revenue in the first year of such increase is that the low-wealth district is hindered, if not forestalled, in its choice of curriculum and in its pursuit of a qualitative educational program.

The trial court has found as a fact that the result of the state school financing scheme

---

11. The constitutionality of school finance schemes under state constitutional requirements of various degrees of similarity to *Colo. Const.* Art. IX, § 2 has been tested in numerous state courts with differing results. *See Pauley v. Kelly*, 225 S.E.2d 859 (W.Va.1979). For a summary of the state constitutional provisions and the courts' interpretations of them, *see generally, Developments in the Law—The Interpretation of State Constitutional Rights*, 95 *Harv.L.Rev.* 1324, 1444–1463 (1982).

12. The majority states:

> ... Article IX, Section 2 of the Colorado Constitution is satisfied if thorough and uniform educational opportunities are available through state action in each school district. ... this constitutional provision does not prevent a local school district from providing additional educational opportunities *beyond this standard.* (Emphasis added.)

is to furnish low assessed valuation school districts with funding so inadequate that they have no meaningful ability to exercise their constitutional right and obligation to control instruction in their own schools. The constitutional mandate of uniformity, whatever its full contours may be, requires more than this.[13]

Accordingly, I would hold that the statutory school financing scheme in Colorado violates the requirements of *Colo.Const.* Art. IX, § 2.

### III.

The majority, concluding as it does that the trial court erred in its constitutional interpretations and so reversing its judgment, finds no need to address the appropriateness of the remedies adopted by the trial court. Similarly, I conclude that it is neither necessary nor appropriate to address them in this dissent.

### IV.

I join that portion of Justice Dubofsky's dissenting opinion in which she concludes that the 20% of assessed valuation limit on school district bonded indebtedness and the 4 mill capital reserve fund ceiling offend against *Colo.Const.* Art. IX, § 2.

For the reasons stated in this opinion, I would affirm the ruling of the trial court that the Colorado public school financing scheme violates the Constitution of the state of Colorado.

*APPENDIX TO JUSTICE LOHR'S DISSENT—Excerpts from the findings of fact made by Honorable Joseph R. Quinn in the trial court.*

II. *The Colorado Public School Finance System in Operation*

 A. *The Relationship Between Assessed Valuation and a School District's Fiscal Ability*

Colorado school districts vary widely in the amount of taxable property wealth per pupil within their boundaries. In 1977, the assessed valuation per pupil among Colorado school districts ranged from a high of $326,269 per pupil to a low of $4,197 per pupil, a ratio of almost 78 to 1. Eliminating the extremely high and low districts, the range between the 90th and 10th percentile of districts in assessed valuation per pupil in 1977 still remained at a ratio of 5.3 to 1. The state average of assessed valuation per pupil in 1977 was $29,165. The average assessed valuation per pupil for 1977 in the sixteen districts in which the plaintiff schoolchildren reside was only $10,563, about one-third of the state average. As a result of variations in assessed valuations per pupil, school districts with high assessed valuations per pupil have a greater fiscal ability to raise revenue for educational purposes from local taxes than do many other school districts in the state, including the sixteen districts in which the plaintiff schoolchildren reside. In South Conejos School District a one mill levy on the assessed valuation of property per pupil raised $5.90 per pupil in 1977, while the same one mill levy in Rangely School District raised $326.27 per pupil.

 B. *The Relationship Between Local Taxable Wealth and a School District's Authorized Revenue Base*

When the Public School Finance Act of 1973 was enacted, the historical variations then existing among school districts in local fiscal ability accounted for substantial disparities in expenditures per pupil among the districts, regardless of pupil size. The Public School Finance Act of 1973 assigned each district an authorized revenue base determined on the basis of the district's 1973 revenues per pupil from state and local sources.

In 1977, authorized revenue bases ranged from a high of $3,101 per pupil to a low of

---

**13.** A possible partial formulation of the right that would give effect to both state and local responsibilities is "the right to require that the school district in which the child lives have the power to obtain revenues per pupil equal to those obtainable in other local school districts." This standard might be refined to reflect differences in costs among districts.

$1,004 per pupil, a ratio of three to one. Eliminating the extremes at both ends, the range in authorized revenue bases between school districts at the 90th percentile and the 10th percentile still remained at a ratio of almost two to one. The state average was $1,446. The sixteen districts in which plaintiff schoolchildren reside were below the state average, and among themselves averaged $1,138 per pupil, which was more than $300 per pupil lower than the state average.

In 1977, school district total expenditures ranged from a high of $4,888 per pupil to a low of $1,212 per pupil, a ratio of about four to one. Eliminating the terminal extremes, the range in total expenditures per pupil for districts at the 90th percentile and the 10th percentile was still over two to one. The state average was $2,020 per pupil. The sixteen districts in which the plaintiff schoolchildren reside were below the state average, and among themselves averaged $1,597, which was more than $400 per pupil below the state average.

The statutory scheme of public school finance has permitted districts with relatively high assessed valuations per pupil to generate relatively high authorized revenue bases and expenditure levels. On the other hand, districts with relatively low assessed valuations per pupil have relatively low authorized revenue bases and low per pupil expenditure levels. In 1977, South Conejos School District taxed itself 35 mills to spend $1,057 per pupil, while Summit School District taxed itself only 18 mills to spend $1,896 per pupil. Of the 45 districts with the highest authorized revenue bases in 1977, all were above the state median in assessed wealth per pupil. Of the 45 districts with the lowest authorized revenue bases in 1977, all but six were below the state median in assessed valuation per pupil. Only two of the 45 wealthiest districts in the state in 1977 had authorized revenue bases below the state median. On the other hand, only five of the 45 poorest districts in the state in 1977 had authorized revenue bases above the state median.

The measure of the strength of the relationship between the variables of authorized revenue bases and assessed valuations per pupil is indicated by the correlation coefficient.[1] The correlation coefficient between authorized revenue bases per pupil in 1977 and assessed valuations per pupil in 1977 was + .5548. The correlation coefficient between total expenditures per pupil in 1977 and assessed valuations per pupil in 1977 was + .4959. With few exceptions, this positive relationship between local wealth and school district authorized spending levels permeates school districts of varying pupil size.

The relative ranking of school districts by authorized revenue bases has not significantly changed since 1973. The correlation coefficient for 1973 and 1977 authorized revenue bases is + .9. Districts which had low authorized revenue bases in 1973, relative to other districts, had equally low authorized revenue bases in 1977, relative to other districts. In the case of the sixteen districts of plaintiff schoolchildren, their relatively unchanged low ranking carries over into 1978, as is apparent from the following table:

| Plaintiff School District | 1973 ARB | 1973 Rank | 1974 ARB | 1974 Rank | 1977 ARB | 1977 Rank | 1978 ARB | 1978 Rank |
|---|---|---|---|---|---|---|---|---|
| Alamosa | 727.00 | 158 | 814.95 | 159 | 1163.04 | 148 | 1347.50 | 132 |
| Center | 743.00 | 150 | 831.25 | 151 | 1111.54 | 163 | 1234.69 | 163 |
| Del Norte | 745.00 | 147 | 835.18 | 148 | 1117.14 | 160 | 1239.92 | 162 |
| Delta | 726.00 | 160 | 812.29 | 161 | 1087.05 | 166 | 1216.83 | 165 |

1. A correlation coefficient is a statistical measure of the degree of association between two variables. Correlations may range from −1.0, a perfect negative correlation (meaning that as one variable increases, the other decreases), to + 1.0, a perfect positive correlation (meaning as one variable increases, so does the other). A zero correlation would imply no relationship at all between the two variables. Generally speaking, positive correlations ranging from 0.0 to 0.3 are considered low, 0.3 to 0.6 moderate, and 0.6 to 0.9 high. (This footnote is not part of the trial court's findings.)

| Plaintiff School District | 1973 ARB | 1973 Rank | 1974 ARB | 1974 Rank | 1977 ARB | 1977 Rank | 1978 ARB | 1978 Rank |
|---|---|---|---|---|---|---|---|---|
| East Otero | 734.00 | 157 | 821.93 | 157 | 1161.63 | 149 | 1285.57 | 151 |
| Granada | 790.00 | 128 | 883.96 | 129 | 1159.51 | 150 | 1284.86 | 152 |
| Ignacio | 552.00 | 181 | 750.00 | 171* | 1042.66 | 180 | 1168.00 | 179 |
| Johnstown | 849.00 | 108 | 941.81 | 109 | 1211.06 | 131 | 1399.37 | 114 |
| Manzanola | 751.00 | 144 | 841.50 | 145 | 1124.78 | 159 | 1252.54 | 159 |
| Monte Vista | 694.00 | 164 | 778.06 | 164 | 1100.93 | 164 | 1246.55 | 160 |
| Montezuma Cortez | 655.00 | 170 | 750.00 | 168* | 1042.71 | 179 | 1168.23 | 178 |
| Montrose | 749.00 | 146 | 839.14 | 147 | 1219.95 | 129 | 1351.11 | 131 |
| Pueblo | 738.00 | 153 | 827.29 | 154 | 1259.74 | 115 | 1381.60 | 121 |
| Rocky Ford | 694.00 | 165 | 821.93 | 158 | 1165.69 | 146 | 1287.74 | 150 |
| South Conejos | 614.00 | 178 | 750.00 | 174* | 1057.44 | 172 | 1181.08 | 173 |
| Trinidad | 740.00 | 151 | 828.43 | 153 | 1184.44 | 137 | 1308.13 | 142 |

\* In the 1974 ARB ranking, several school districts which had identical ARBs of $750.00 are ranked from 166–181 in alphabetical sequence by the Colorado Department of Education.

In many cases the authorized revenue bases of wealthy districts have increased more, in terms of actual dollar amounts, than the authorized revenue bases of property-poor districts, thereby resulting in a greater net dollar disparity in 1977 and thereafter than existed in 1973. Furthermore, tax mill rates in several property-poor districts have increased at a greater rate than in property-rich districts, in spite of the fact that in many cases the authorized revenue bases in overall dollar amounts have increased in property-rich districts at a pace greater than dollar increases in property-poor districts.

A factor which is persuasively explanatory of disparities in school districts' authorized revenue bases in <u>1977</u> is the assessed valuation per pupil in these districts in <u>1973</u>. The correlation coefficient between <u>1977</u> authorized revenue bases and <u>1973</u> assessed valuations per pupil is + .7630. This correlation coefficient indicates that local taxable wealth and wealth-related spending disparities, as they existed prior to and including 1973, continued to exert an influence on authorized spending levels for public education in the state of Colorado as late as 1977.

C. *The Effect of State Equalization Aid and Minimum Guarantee Money on a School District's Fiscal Ability*

State equalization aid does increase a school district's fiscal capacity by raising the revenue producing potential of a one mill levy. However, state equalization aid, which is limited to the per pupil-per mill levels of $31.92 in 1977, $35.00 in 1978, $42.25 in 1979, and $45.85 in 1980, is simply incapable of equalizing the revenue raising potential of low-wealth districts with high-wealth districts.

Furthermore, the statutory minimum guarantee per pupil per mill actually *increases the disparity* in the fiscal ability of school districts to raise revenue for educational purposes due to the fact that the money is given to districts fully capable of raising more than the guaranteed level of state equalization aid from their own local taxable wealth. The *minimum* guarantee per pupil per mill was $10.85 in 1977, $11.35 for 1978, and will be $11.35 for 1979 through 1983. In 1977, the true measure of the state's efforts to *equalize* school districts' fiscal abilities was not the state equalization level of $31.92, but rather was $21.07 per pupil per mill—the result of subtracting the minimum guarantee per pupil per mill ($10.85) from the level of state equalization aid per pupil per mill ($31.92). Only those school districts incapable of raising $21.07 or more per pupil per mill in 1977 were "equalized" with other districts fully capable of raising that amount or more, and the extent of "equalization" was only up to the level of $21.07. Districts fully capable

of raising $21.07 or more per pupil per mill nevertheless received the minimum guarantee money of $10.85 per pupil per mill and, to that extent, inter-district fiscal disparity was exacerbated in inverse proportion to actual need. Likewise, in 1978 the true measure of the state's equalization effort was $23.65 per pupil per mill—the result of subtracting the minimum guarantee per pupil per mill in 1978 ($11.35) from the level of state equalization aid per pupil per mill in 1978 ($35.00).

Colorado school districts vary widely in the amount of revenue per pupil per mill generated by the same mill rate, even with state assistance, and this variation is positively related to district wealth or assessed valuation per pupil. While state financial assistance to property-poor school districts to some extent alleviates the disparities which result from wide variations in assessed wealth per pupil among the school districts, substantial differentials remain in the revenue available in districts and, consequently, in the level of educational expenditures. State financial assistance is simply inadequate to offset inequalities inherent in a financing system based on widely varying local tax bases. Variations in local assessable property wealth have caused, and are continuing to cause, substantial disparities in expenditures per pupil among school districts, including the sixteen school districts in which the plaintiff schoolchildren reside. In fact, the sixteen school districts of the plaintiff schoolchildren spend substantially less money per pupil than many other school districts in the state.

D. *The Relationship Between School District Ability to Increase Expenditures and Local Taxable Wealth*

Some school districts in the state, including the sixteen school districts of plaintiff schoolchildren, lack the fiscal ability significantly to exceed their authorized revenue bases even if the State School District Budget Review Board might authorize an increase. Under the statutory system of public school finance, an increase in an authorized revenue base must be funded in the first year solely out of local revenue sources. To the extent that school districts vary widely in their local taxable wealth per pupil, to that same extent they vary in their fiscal ability to fund increases in authorized revenue bases. For example, in 1977 the amount of revenue per pupil per mill obtained from tax levies on local property varied among school districts from $4.20 in Fountain School District to $326.27 in Rangely School District. A high-wealth district such as Rangely, with an assessed valuation of $326,269 per pupil in 1977 and $339,677 per pupil in 1978, is able to fund a $100 per pupil increase in its authorized revenue base with an additional mill levy of only 0.3 mills, while a low-wealth district, such as South Conejos with an assessed valuation of $5,898 per pupil in 1977 and $6,012 in 1978, would be required to increase its mill levy by approximately 17 mills to raise the same $100 per pupil.

Subsequent to 1973 high-wealth districts have received larger increases in dollar amounts in authorized revenue bases from the State School District Budget Review Board than low-wealth districts. Additionally, high-wealth districts have experienced equally greater success in obtaining electorate approval of increases in authorized revenue bases. Although the amount of money raised locally is to some extent the product of the willingness of local residents to tax themselves, as a practical matter school districts with a small tax base simply cannot raise their mill rates to the level necessary to match the authorized revenue bases attainable by the more wealthy districts with less onerous tax efforts on the part of these wealthy districts. South Conejos School District, for example, in the first year of an increase would have had to raise its mill rate of 35 mills by 142 additional mills in order to raise its 1977 authorized revenue base of $1,057 to the $1,897 level enjoyed by Summit School District at a mill rate of only 18 mills. The practical consequence of requiring a low-wealth district to pay for an increase in its authorized revenue base solely out of local tax revenue in the first year of such increase is that the low-wealth district is curtailed, if not out-

 rightly prevented, from pursuing a higher quality educational program for its students and from making significant choices in its curriculum and total educational program.

Local district wealth also significantly impacts on the two primary methods of funding capital outlay, the capital reserve and bond redemption funds. Both funds are financed entirely out of local tax revenues. The capital reserve fund is subject to a statutory maximum tax levy of 4 mills. High-wealth districts can raise more revenue for the statutory maximum of 4 mills than can low-wealth districts, even with the same capital reserve tax rate. In 1977, Frisco School District, with a tax levy of 4 mills, raised $386.52 per pupil for its capital reserve fund, while South Conejos School District, for the same 4 mill levy, raised only $23.60 per pupil. In 1977, the top ten percent of the school districts, in terms of assessed valuation per pupil, levied at an average capital reserve tax rate of 3.51, which yielded an average of $254.79 per pupil or $72.59 per pupil per mill. By contrast, the bottom ten percent of the districts, in terms of assessed valuation per pupil, levied at an average capital reserve tax rate of 3.50 and raised an average of $28.68 per pupil, which is $8.01 per pupil per mill. Eliminating the extremely high and extremely low districts in terms of assessed valuation per pupil, the districts at the second decile levied at an average capital reserve rate of 3.01 for an average yield of $117.76 per pupil, which is $39.12 per pupil per mill. The districts at the ninth decile levied at an average capital reserve tax rate of 3.67 for an average yield of $40.16 per pupil, which is $10.95 per pupil per mill.

The bond redemption fund is utilized to pay off a district's bonded indebtedness for long-term capital needs. Bonded indebtedness must be approved by the electorate in each district and is limited by statute to twenty percent of a district's assessed valuation. Under the statutory structure, high-wealth districts are more capable than low-wealth districts of assuming and financing a greater level of indebtedness for capital improvements. For example, South Conejos School District with 782 students had a debt ceiling of $935,020 for 1977 and $954,452 for 1978, while Granby School District with 838 students had a debt ceiling of $8,173,380 for 1977 and $8,833,818 for 1978 —a ratio of approximately one to nine.

Generally, low-wealth districts have higher bond redemption tax rates than high-wealth districts but produce far less revenue per pupil for each mill levy. In 1977, the school districts at the highest decile in terms of assessed valuation per pupil levied at an average bond redemption rate of 3.33 for an average yield of $206.81 per pupil, or $62.11 per pupil per mill. By contrast, school districts at the lowest decile in terms of assessed valuation per pupil levied at an average rate of 8.04 for a yield of $61.62 per pupil, or $7.66 per pupil per mill. Eliminating the high and low extremes, those districts in the second decile levied at an average bond redemption tax rate of 3.53 for a yield of $130.41 per pupil, or $36.94 per pupil per mill. Those districts in the ninth decile levied at an average bond redemption tax rate of 8.44 for a yield of $91.96 per pupil, or $10.90 per pupil per mill.

\* \* \*

F. *The Effect of Subsequent Amendments to the Public School Finance Act (Senate Bills 138 and 25) on the System of Educational Finance for Colorado's Schoolchildren*

Senate Bill 138, Colo.Sess.Laws 1977, Vol. I, ch. 264 at 1063–69, was enacted in 1977 and was directed to school district funding for 1978. It increased state equalization aid per pupil per mill to $35.00 in 1978, and increased the minimum guarantee to $11.35 per pupil per mill in 1978. The bill also granted districts with high concentrations of children from low-income families additional aid of $125.00 for every low-income child in excess of fifteen percent of the total district attendance entitlement, and to this extent implicitly recognized the negative effect of personal poverty on educational achievement. However, since the bill primarily addressed educational funding for 1978, it is a stopgap only and does not significantly affect the overall framework of public school finance.

Senate Bill 25, Colo.Sess.Laws 1978, ch. 69 at 369–74, is much broader in scope than Senate Bill 138. It raises state equalization aid to $42.25 per pupil per mill in 1979, and to $45.85 in 1980. The minimum guarantee is raised to $12.35 in 1979 and $13.35 thereafter, except for districts with mill rates at twenty or less, in which case the minimum guarantee remains at $11.35 per pupil per mill. With respect to authorized revenue bases, Senate Bill 25 permits, but does not require, each district to attain specified levels for 1979 through 1981: $1400 in 1979, with a permitted increase of at least $130 to all districts including those with authorized revenue bases in excess of $1400; $1600 in 1980, with an increase of at least $140 for all districts including those with authorized revenue bases in excess of $1600; and $1800 in 1981, with an increase of at least $150 for all districts including those with authorized revenue bases in excess of $1800. In 1982 all districts will be permitted to increase their authorized revenue base by $160 per pupil, and after 1982 an annual increase of seven percent is authorized, unless the law is changed in the interim by the General Assembly.

Assuming no increases in authorized revenue bases are permitted by the State School District Budget Review Board or by the local electorate, and further assuming that all low-wealth districts choose to spend at the levels authorized by Senate Bill 25, the application of the bill to current funding patterns will result in a reduction in spending disparities between districts with high and low authorized revenue bases of $246 per pupil from 1979 to 1982. Under present funding conditions the range of increase in authorized revenue bases in 1979 varies under Senate Bill 25 from $130 per pupil for high-spending districts to $266 per pupil for the lowest-spending district in 1978. This range of increase results in a net reduction in disparity of $136 per pupil. In 1980, Senate Bill 25 will permit an increase from $140 to $200 per pupil, a net reduction in disparity of $60 per pupil. In 1981, increases in authorized revenue bases under Senate Bill 25 will range from $150 to $200, a further net reduction in disparity

of $50 per pupil. In 1982, all districts will receive the same increase, so that no reduction in absolute spending disparities will occur in that year. Beginning in 1983 and thereafter, Senate Bill 25 permits authorized revenue bases for all districts to increase by seven percent. At this point of implementation authorized revenue bases actually will become more disparate for the obvious reason that a seven percent increase will result in a larger dollar increase for a high-spending district than for a lower-spending district. For example, a district with an authorized revenue base of $3000 in 1983 would receive a $210 increase, while a district with an authorized revenue base of $2000 would receive only a $140 increase. Thus, beginning in 1983, it can reasonably be expected that, absent countervailing legislation, spending disparities will once again increase and thereby vitiate the disparity reduction wrought by Senate Bill 25 in the preceding years.

Furthermore, Senate Bill 25 does not *require* school districts to spend at the authorized revenue base levels established for the years 1979 through 1983. School districts are free to spend at a lower level and consequently enjoy a lower mill rate than would be required for the permitted statutory level. If low-wealth districts choose to spend at levels lower than those authorized by Senate Bill 25, then any reduction in current spending disparities achieved by Senate Bill 25 will be neutralized, at least to the extent of the difference between the spending level authorized by statute and the lower spending level selected by the district.

While Senate Bill 25 will reduce current spending disparities by a maximum of $246 per pupil from 1979 tc 1983, one cannot accurately predict authorized revenue bases after 1980. Under the present statutory scheme, funding for state equalization aid will remain constant after 1980, at least in the absence of any further legislation. If funding for state equalization aid does remain constant, then low-wealth districts will be required to raise their mill rates substantially in order to receive permitted

 authorized revenue base increases. If low-wealth districts do not raise their mill rates to the level necessary to reach the permitted authorized revenue bases, then the maximum possible reduction in current spending disparities of $246 per pupil will not occur under Senate Bill 25.

Assessment of the extent to which Senate Bill 25 reduces current spending disparities can be more accurately gauged when the period of assessment is limited to the years 1979 and 1980. During these years the maximum possible reduction in current spending disparities between the highest and lowest spending districts in the state will be $196 per pupil ($136 in 1979 and $60 in 1980). This calculation assumes that no increases in authorized revenue bases are approved by the State School District Budget Review Board or by the local electorate, and further assumes that all low-wealth districts choose to spend at the authorized revenue base levels permitted by Senate Bill 25 in 1979 and 1980. However, while Senate Bill 25 might well achieve a reduction of $196 in current spending disparities during the period of 1979–80, nevertheless significant differences in actual spending will continue to exist among school districts. For in spite of the ameliorative effects of Senate Bill 25 in reducing disparity, local district taxable wealth will remain unaffected and will continue to be strongly correlative to school district fiscal potential and spending ability.

In 1977, school districts at the highest decile in terms of assessed valuation per pupil had an average authorized revenue base of $1950. On the other hand, school districts at the lowest decile in terms of assessed valuation per pupil had an average authorized revenue base of $1153. The difference between these two levels of districts was $797 per pupil. In 1980, the difference in authorized revenue bases between the highest and lowest deciles of districts will be $750 per pupil, a net reduction of only $47 per pupil. Thus, considered by themselves, increases in minimum authorized revenue bases under Senate Bill 25 will not eliminate the wealth-related spending disparities which presently exist among districts.

Additionally, Senate Bill 25 does not change the requirement that a school district must pay for any authorized revenue base increase solely out of local property tax revenues in the first year of such increases. The maximum reduction in current spending disparities affected by Senate Bill 25 for the years 1979 to 1980—$196 per pupil—may never occur if high-wealth, high-spending districts increase their authorized revenue bases at a faster rate than low-wealth districts. Senate Bill 25 does not prohibit high-wealth districts from increasing their authorized revenue bases, and if wealthy districts increase their authorized revenue bases, the spending disparities currently existing between high-wealth and low-wealth districts will be further widened.

On a practical level a formidable incentive exists for wealthy districts to seek increases in their authorized revenue bases for the next few years. The increases provided in Senate Bill 25 most probably will fall below threadbare inflationary increases as gauged by current economic trends. For example, in 1980 the $140 per pupil increase in authorized revenue bases will amount to a seven percent increase for a district spending at $2,000 per pupil. However, for a district spending at the level of $2,500 per pupil, the $140 per pupil increase will amount only to a 5.6 percent increase, thereby forcing that district either to cut back programs or to seek an increase in its authorized revenue base from the State School District Budget Review Board or its local electorate.

The long and short of the matter of school district funding under Senate Bill 25 is that the spending patterns of school districts after 1980 are conjectural at best. Those patterns are dependent on legislative action or inaction with respect to state equalization aid, the rate of increase in assessed valuation, the chosen response of districts to the post-1980 status of statutory equalization aid, and the continuation or cessation of present inflationary trends.